1

2

Honorable Benjamin H. Settle
Honorable J. Richard Creatura

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

DARRICK L. HUNTER,

11

Plaintiff,

Case No. C18-5198-BHS-JRC

12

v.

13

CHARLES N. ROHRER, SERGEANT;
AND TIMOTHY J. McCANDLESS,

14

SERGEANT; AND MARGARET
GILBERT, SUPERINTENDENT FOR THE

15

WASHINGTON STATE DEPARTMENT
OF CORRECTIONS IN THEIR

16

INDIVIDUAL AND OFFICIAL
CAPACITIES;

17

Defendants.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

**NOTED ON MOTION CALENDAR:**

**March 19, 2021**

18

19

## I. <u>INTRODUCTION</u>

20

Plaintiff Darrick Hunter worked on a custodial crew at the Stafford Creek Corrections

21

Center ("SCCC") that cleaned extended visitation housing units ("EFVs") in a secured area of

22

the prison known as the HUB.  Hunter and the other inmates that cleaned the EFVs were all

23

Black; when Hunter started in February 2015, they were the only all-Black crew working in the

24

HUB.  Although WSDOC's own records confirm other maintenance crews had more frequent

25

access to the EFVs, defendant Charles Rohrer singled out the all-Black custodial crew alone for

26

routine strip searches and the evidence suggests he did so because of racial animus.  The

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1    evidence also suggests that Rohrer and his colleague defendant McCandless singled out Hunter

2    for further disparate treatment because of his race, such as falsely accusing him of rule violations

3    and trying to get him suspended from his job.  Another supervisor working in the HUB described

4    Rohrer and McCandless as part of the "white supremacy set."  Esler Decl., Ex. 1 (Baldwin Dep.

5    at 24:18 – 25:10, 26:11 – 27:15, 29:5-25, 35:10-12, 16-21).  Rohrer told Hunter directly that

6    Rohrer did not want Hunter's "Black ass" working in the HUB.  Hunter Decl., ¶ 27.

7        Defendants argue that the Court should not consider the merits of Hunter's claims (other

8    than those arising from the strip searches) because Hunter allegedly failed to exhaust his

9    administrative remedies.  It is defendants' burden to prove exhaustion, defendants have failed to

10   do so, and the Court should dismiss that affirmative defense now pursuant to Fed. R. Civ. P.

11   56(f).  *Albino v. Baca*, 747 F.3d 1162, 1176-1177 (9th Cir. 2014)(en banc).  Hunter filed a

12   grievance against defendants Rohrer and McCandless in January 2016 (Dkt. 77, at 110), and

13   continued to lodge grievances for later incidents that he believed demonstrated racial bias (and

14   Rohrer's retaliation against Hunter for filing grievances).  Dkt. 77, at 118, 139.  Hunter also sent

15   a letter directly to Superintendent Gilbert about his claims.  Esler Decl., Ex. 8 (Gilbert Dep.,

16   Ex. 13).  Superintendent Gilbert informed Hunter that she would be investigating his claims

17   further.  Dkt. 76, Ex. 3, at 110, Esler Decl., Ex. 9 (DEFS 000307).  Hunter's grievances provided

18   sufficient information to understand he was complaining that Rohrer and McCandless were

19   treating Black inmates in the HUB (and Hunter in particular) differently because of race, which

20   is sufficient.  *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

21       Per SCCC's grievance policy, Hunter's grievances about employee conduct had to be

22   dealt with by the superintendent's office (Dkt. 77, at 21, 55), so it was in Gilbert's hands to

23   investigate.  Hunter inquired numerous times to the grievance coordinator (officer Dahne) about

24   the status of Gilbert's investigation, and was told repeatedly that he (Hunter) had done all that he

25   needed to do.  Esler Decl., Ex. 2 (Hunter Dep. at 157:9–159:3).  Hunter also attempted to contact

26   Gilbert to inquire about the status of the investigation, but Gilbert failed to respond.  Esler Decl.,

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 2

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON 98121

1   Ex. 2 (Hunter Dep. at 158:8–159:23).  Gilbert's team never provided their findings to Hunter; he

2   did not receive them until produced in discovery.  Esler Decl., Ex. 2 (Hunter Dep. at 158:8–

3   161:10).  When prison officials do not respond to a grievance, administrative remedies are

4   effectively unavailable and exhausted.  *Dole v. Chandler*, 438 F.3d 804, 809, 811 (7th Cir. 2006);

5   *accord Sapp v. Kimbrell*, 623 F.3d 813, 822-823 (9th Cir. 2010) (approving of *Dole*'s holding).

6        Finally, the officers involved do not have qualified immunity to engage in racial

7   discrimination.  Hunter adequately exhausted his administrative remedies; there are sufficient

8   questions of fact regarding Hunter's claims against Rohrer and McCandless[1] to go to the jury.

9   **II. <u>STATEMENT OF FACTS</u>**

10  **A.**     **HUNTER WAS AMONG THE FIRST BLACK INMATES TO WORK IN THE HUB.**

11

12       Hunter was hired into the Washington State Department of Corrections ("DOC") work

13  training program at SCCC on February 23, 2015. Declaration of Darrick L. Hunter ("Hunter

14  Decl.") ¶ 3.  Hunter was assigned to SCCC's Facility Maintenance as a Custodial porter, and

15  Mark Sherwood ("Sherwood") was his manager.  *Id.*  Hunter worked as a Custodial porter from

16  February 23, 2015 – January 29, 2016, and then again from April 20, 2016 – November 22,

17  2016.  Hunter Decl., ¶ 3.

18       The custodial shop, along with other facility maintenance positions, were located in a

19  secured area of SCCC known as the HUB.  *Id.* at ¶ 3.  To enter or exit the HUB, inmates would

20  go through a metal detector and were searched.  Esler Decl., Ex. 3 (Sherwood Dep. at 32:6-19).

21  To work in the HUB at all, inmates had to be free of major infractions.  Esler Decl., Ex. 3

22  (Sherwood Dep. at 44:21-25).

23       Hunter was part of a custodial crew responsible for cleaning SCCC's Extended Family

24  Visitation Housing Units ("EFVs") located in the HUB.  Hunter Decl., at ¶ 6.  SCCC used the

25  EFVs as quarters for inmates to participate in family visits.  Dkt. 29 at 2-3.  SCCC policies

26  ---
    [1] Hunter has separately agreed to dismiss defendant Gilbert.  Dkt. No. 81.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 3

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1    insured both inmates and family members participating in these visits were subject to strict

2    security measures.  Dkt. 73, at 2; Declaration of Eugene Tremble ("Tremble Decl.") at ¶ 7;

3    Declaration of Jasper Harris ("Harris Decl.") at ¶ 9.  Corrections officers thoroughly searched the

4    EFV units for contraband before any inmate workers (known as "porters") entered the EFV

5    Units.  Esler Decl., Ex. 3 (Sherwood Dep. at 121:24–123:1); Dkt. 73, at 2.  Many other

6    correctional industries crews also worked in the HUB, such as HVAC, electrical, bike, carpentry,

7    lawn and garden, paint, construction maintenance, metal, and plumbing, among others. Hunter

8    Decl. at ¶ 4.

9          On about July 16, 2014, Mark Sherwood took over the custodial supervisor position in

10   the HUB.  Esler Decl., Ex. 3 (Sherwood Dep. at 68:23); Esler Decl., Ex. 10 (Sherwood Dep.,

11   Ex 3).  When Sherwood took that position, there were no Black workers working in the HUB.

12   Esler Decl., Ex. 3 (Sherwood Dep. at 145:19 – 146:4); Esler Decl., Ex. 10 (Sherwood Dep.,

13   Ex. 3).  Sherwood hired the first Black worker in the HUB area shortly after he became

14   supervisor; indeed, he hired mostly Black workers during his tenure as custodial supervisor.

15   Esler Decl., Ex. 3 (Sherwood Dep. at 34:22 – 35:15, 37:8-11, 145:19 – 146:4).

16         In about October 2014, after Sherwood hired yet another Black worker, defendant

17   McCandless asked Sherwood "why are you hiring all these Blacks?"  Esler Decl., Ex. 3

18   (Sherwood Dep. at 54:19-25, 56:23 – 57:21); Esler Decl., Ex. 10 (Sherwood Dep., Ex. 3).

19   Rohrer made similar statements to Sherwood.  Esler Decl., Ex. 3 (Sherwood Dep. at 57:25 –

20   59:12; Esler Decl., Ex. 10 (Sherwood Dep., Ex. 3).  Rohrer and McCandless started referring to

21   Sherwood and his shop as "Sher-hood" because Sherwood hired Black workers.  Esler Decl.,

22   Ex. 3 (Sherwood Dep. at 76:17 – 25); Tremble Decl., ¶ 13.  Throughout Sherwood's tenure as

23   custodial supervisor, his custodial crew was the only crew in the HUB that had Black inmates

24   working in it. Esler Decl., Ex. 3 (Sherwood Dep. at 145:19 – 146:4).

25         Secretary Gilbert raised concerns with SCCC supervisors regarding the racial makeup of

26   the offenders working in the HUB area after inmates sent complaints to Gilbert and to Olympia

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 4

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   calling attention to the fact that Black inmates were unable to get jobs with HUB access.  Esler

2   Decl., Ex. 4 (Gilbert Dep. at 30:12–31:13); Esler Decl., Ex. 2 (Hunter Dep. at 52:7–53:1).  Ed

3   Baldwin, who was another supervisor in the HUB, described Rohrer and McCandless as part of

4   the "white supremacy set."  Esler Decl., Ex. 1 (Baldwin Dep. at 24:18 – 25:2, 26:11 – 27:15,

5   28:13 – 29:20, 35:10 – 36:6).

6   **B.   AFTER SHERWOOD STARTED HIRING BLACK INMATES, ROHRER**
        **ORDERED CONSTANT STRIP SEARCHES OF SHERWOOD'S CREW.**

7

8           The State claims that sometime "in 2014" it received information that drugs were

9   entering the SCC through the EFV units via an offender on the custodial crew.  Dkt. 29, ¶ 6.

    However, the available evidence suggests that these incidents occurred before Mark Sherwood

10  became supervisor in July 2014.  Dkt. 29; Dkt. 31, ¶ 4; Esler Decl., Ex. 11 (DEFS 001208-DEFS

11  001209).  Sherwood's custodial crew members had nothing to do with the breaches of security

12  and smuggling of contraband.  Esler Decl., Ex. 3 (Sherwood Dep. at 35:19–37:20); Esler Decl.,

13  Ex. 5 (Rohrer Dep. at 184:21-185:4).  By October 15, 2014, Sherwood had hired about three

14  Black inmates to work on his custodial crew.  Esler Decl., Ex. 10 (Sherwood Dep. Ex. 3);

15  Tremble Decl., ¶ 4.  Shortly after, defendant McCandless asked Sherwood why he was hiring all

16  these Black guys.  Esler Decl., Ex. 10 (Sherwood Dep., Ex. 3).  One of the crew members

17  (Eugene Tremble, who is Black) noticed Rohrer and McCandless watching them in a different

18  way, as if Rohrer and McCandless were looking to find things wrong.  Tremble Decl., ¶ 6.

19          On November 4, 2014, Chris Idso ("Idso") sent an email to McCandless and Rohrer

20  informing them "it is the expectation that offenders working in the EFV's in a semi supervised

21  capacity will be strip searched when they are done.  Semi-supervised means any offender that

22  leaves the direct line of site [sic] of his/her supervisor.  Under this definition, it will always mean

23  the porter crews."  Hunter Decl. at ¶ 10, Ex. 3.  "Porter crews" at SCCC refers to *all* facility

24  maintenance crews, not just Sherwood's custodial cleaning crew.  Hunter Decl. at ¶ 13; *see also*

25  Esler Decl., Ex. 3 (Sherwood Dep. at 87:12-14; 115:24 – 116:17 (other maintenance crews were

26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 5

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

also "porters").  There are "porters" on the custodial crew, mechanical crew, construction crew, etc.  Hunter Decl., at ¶ 13.  Indeed, Idso's email refers to "crews" – plural – not a particular "crew."  Idso was ordering strip searches of *any* crew member who worked in the EFV Units and left the direct line of sight of a supervisor, not strip searches of just the all-Black custodial crew.

Rather than implement that policy to apply to all inmate crews working in the EFVs regardless of race, Rohrer instead sent out an email that day inaccurately ordering that only "EFV cleaning crews . . . be searched before leaving the EFV Unit being cleaned."  Hunter Decl., ¶ 14, Ex. 4; *see also* Esler Decl., Ex. 4 (Gilbert Dep. at 66:12 – 67:24); Ex. 12 (Rohrer email implementing policy).  By doing so, Rohrer singled out Sherwood's all-Black crew alone for regular and consistent strip searches.  Esler Decl., Ex. 5 (Rohrer Dep. at 189:15–22).  An officer conducting a strip search on Hunter told Hunter directly that Rohrer issued the directive to strip search the custodial crew.  Hunter Decl., ¶ 8.  SCCC's own investigation confirmed that the all-Black custodial crew was the "only crew that were getting stripped searched each time they go into the EFVs."  Esler Decl., Ex. 13 (Gilbert Dep., Ex. 17), at 2.

Sherwood hired plaintiff Hunter for his custodial crew around February 23, 2015.  During the time Hunter worked on the custodial crew, all of Sherwood's custodial crew members were Black except for one Caucasian crew member who did not work alongside the rest of the crew and never cleaned the EFVs.[2]  Hunter Decl. at ¶ 6; Esler Decl., Ex. 2 (Hunter Dep. at 52:7–16, 53:16–21); Jasper Decl., ¶ 4; Tremble Decl., ¶ 4.  There were many other work training shops offered by SCC in the HUB area, but these crews consisted of mostly Caucasian and non-Black offenders, which Rohrer and McCandless seemed to prefer.  Esler Decl., Ex. 2 (Hunter Dep. at 52:7–54:22); Tremble Decl. at ¶ 7; Harris Decl. at ¶ 9; Esler Decl., Ex. 3 (Sherwood Dep. at 144:18 – 146:12); Esler Decl., Ex. 1 (Baldwin Dep. at 6:23 – 7:23, 10:11-13, 22-24; 12:15-25).

---

[2] Sherwood's custodial crew had one white inmate worker for a while (David DeSpain), but that white inmate never worked cleaning the EFV units.  Hunter Decl., ¶6; Esler Decl., Ex. 3 (Sherwood Dep. at 36:15 – 23, 37:8-11, 112:23 – 113:14) (confirming that DeSpain never worked in the EFVs).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 6

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1  Sherwood's custodial crew was the only porter crew that consisted of all-Black inmates.  Hunter

2  Decl., ¶ 6; Tremble Decl., ¶¶ 4, 7.  As confirmed by one of the HUB supervisors, "the majority

3  of the workers in the HUB are white."  Esler Decl., Ex. 1 (Baldwin Dep. at 18:25 – 19:1).

4        On about March 20, 2015, Hunter witnessed Sherwood walk into the custodial shop

5  visibly upset and agitated.  Hunter Decl. at ¶ 9.  While Sherwood was on the phone, Hunter

6  overheard him say that he was approached by Rohrer and McCandless, who had asked him again

7  "why are you hiring all these Blacks on your crew?"  Hunter Decl. at ¶ 9; *accord* Esler Decl.,

8  Ex. 3, (Sherwood Dep. at 54:4 – 55:5, 56:23–58:19) (confirming those statements); Dkt. No. 3,

9  ¶4.4.[3]  Additionally, other inmates approached Hunter and informed him that Rohrer did not

10  want Black offenders working in the HUB.  Esler Decl., Ex. 2 (Hunter Dep. at 29:4–11).

11        As the State's own records show, other facility maintenance crews, such as construction

12  maintenance, entered the EFV Units regularly and *more ofte*n than Sherwood's all-Black

13  custodial crew, and thus presumably posed the same security risks (as indeed was the conclusion

14  in Idso's original email instructing that all crews be strip searched).  Hunter Decl., ¶¶ 7 – 8,

15  Ex. 1.  Hunter has gone through the State's records, and identified over a dozen instances where

16  those records confirm that the custodial crew was in the EFVs on the same date as other facility

17  maintenance crews.  Hunter Decl., ¶ 8.  Hunter also testifies that he recalls working "in the same

18  EFV Units at the same time as the other Facility Maintenance porter crews, yet [his] Black

19  coworkers and [he] were the only inmates strip searched upon exiting the EFV Units . . . ."

20  Hunter Decl., ¶ 8; *see also* ¶¶ 7, 19-20 (explaining the regularity with which other crews would

21  work in the EFVs, often at the same time as Hunter); Esler Decl., Ex. 10 (Sherwood Dep., Ex. 3).

22        The Black custodial crew "was the only crew that was regularly strip searched even

23  though many other porter crews were entering and exiting the EFV Units, often at the same

24  time" as Hunter's custodial crew.  Hunter Decl., ¶ 14; Esler Decl., Ex. 2 (Hunter Dep. at 50:8–

25

26  [3] This is Hunter's handwritten, verified complaint, the facts of which he verified and declared "under the penalty of perjury," which should be sufficient to also render them evidence.  28 U.S.C. § 1746.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 7

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 / F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1    18); Tremble Decl., ¶ 7.  The custodial crew reportedly entered the EFV Units 60 times between

2    the years of 2014 and 2016, while the construction maintenance crew entered the EFV Units 95

3    times during that same period.  Hunter Decl. at ¶¶ 8, 20–21, Ex. 1.

4         Sherwood's custodial crew members had nothing to do with the breaches of security and

5    smuggling of contraband, all of which occurred before Sherwood became supervisor in July

6    2014.  Esler Decl., Ex. 3 (Sherwood Dep. at 35:19–37:20); Esler Decl., Ex. 5 (Rohrer Dep. at

7    184:21-185:4).  Hunter and his crew were subject to at least 25 strip searches or more.  Hunter

8    Decl. at ¶¶ 16-17.  Notably, Hunter recalls many more strip searches than shown in the State's

9    records, and the State seems to admit it does not have complete records of the strip searches

10   actually conducted.  Hunter Decl., at ¶¶ 16-17; Esler Decl., Ex. 5 (Rohrer Dep. at 193:23 –

11   194:6, 207:8 – 14); Esler Decl., Ex. 3 (Sherwood Dep. at 125:22 – 127:10).

12        The Rohrer-implemented strip searches of the custodial crew were not conducted

13   consistent with DOC Policy 420.310 (attached as Exhibit 5 to the Hunter Declaration).  For

14   example, the strip searches of Hunter and the rest of the custodial crew were improperly carried

15   out inside the EFV Units for a long period and were not properly recorded. Esler Decl., Ex. 14;

16   Esler Decl., Ex. 2 (Hunter Dep. at 13:21–15:8).  Further, SCCC security staff made Hunter touch

17   his genitals repeatedly during strip searches.  Esler Decl., Ex. 2 (Hunter Dep. at 15:6–19).  As a

18   result, Hunter, Harris, and Tremble complained to Sherwood about how SCCC staff would

19   engage in inappropriate conduct during these searches, and that the manner in which they were

20   occurring was making them uncomfortable.  *Id.*

21        Hunter and his colleagues (Harris and Tremble) complained that other crews (consisting

22   mostly of white offenders) in other shops were allowed to work in the EFV Units without being

23   subjected to a strip search and that they were being treated differently because they were Black.

24   Tremble Decl., ¶ 7; Harris Decl., ¶ 9.  On or about January 20, 2016, Hunter, Harris, and

25   Tremble told Sherwood that he should not hire any more Black offenders on his crew to prevent

26   Rohrer and McCandless from harassing other Black offenders.  Esler Decl., Ex. 2 (Hunter Dep.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 8

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 / F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1  at 152:15–153:2).  When questioned by McCandless about why he was hiring "all these Black

2  guys," Sherwood told him that he was hiring good workers and that it had "nothing to do with

3  color" for him. Esler Decl., Ex. 3 (Sherwood Dep. at 56:23–57:11).  Similarly, Sherwood told

4  Hunter that he was hiring people who are good workers with good conduct, not because they are

5  Black. Esler Decl., Ex. 2 (Hunter Dep. at 153:3–6); Esler Decl., Ex. 3 (Sherwood Dep., 56:23 –

6  57:21).

7  **C.    ROHRER'S MISTREATMENT OF HUNTER WENT BEYOND THE STRIP**

8  **      SEARCHES.**

9          On or about January 20, 2016, Hunter went to lunch and received a lunch box that

10  contained butter brickle and Sun Chips (which contain peanuts and sunflower oil).  Hunter Decl.

11  at ¶ 24.  Hunter told McCandless he could not eat the lunch, as Hunter has a severe food allergy

12  to peanut and sunflower products.  Hunter Decl. at ¶¶ 24–25; Esler Decl., Ex. 2 (Hunter Dep. at

13  81:15–82:7).  Hunter's health status reports ("HSRs") on file in DOC's computer system

14  indicates that Hunter is to be given a special diet meal.  Hunter Decl. at ¶ 24, Ex. 9.  Rohrer saw

15  Hunter discussing his health diet with McCandless, and Rohrer told Hunter that he needed to

16  provide his HSR to obtain a special diet meal.  Hunter Decl. at ¶ 25; Esler Decl., Ex.  2 (Hunter

17  Dep. at 81:15–82:16).  Hunter asked Rohrer to look up his HSR in SCCC's computer system,

18  OMNI (which is a very simple process), but Rohrer refused to do so.  Hunter Decl. at ¶ 25; Esler

19  Decl., Ex. 2 (Hunter Dep. at 81:15–82:21); Esler Decl., Ex. 3 (Sherwood Dep. at 94:10–95:16).

20  Hunter was unable to eat the lunch provided to him that day and simply gave it away.  Esler

21  Decl., Ex. 2 (Hunter Dep. at 81:15–82:21).

22          On or about January 22, 2016, Hunter brought his HSR for the peanut product allergy and

23  his medical records for his sunflower oil allergy to Rohrer, and Rohrer just laughed at Hunter.

24  Esler Decl., Ex. 2 (Hunter Dep. at 81:15 – 82:25); Tremble Decl. at ¶ 8.  Hunter went back to his

25  table and was discussing the incident when Rohrer overheard.  Hunter Decl. at ¶ 26; Esler Decl.,

26  Ex. 2 (Hunter Dep. at 81:15–83:22).  Rohrer pulled Hunter out into the hallway and began

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 9

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1  yelling at him, calling him "a liar," and telling him to "shut up."  Hunter Decl. at ¶ 27; Esler

2  Decl., Ex. 2 (Hunter Dep. at 81:15–85:10).  McCandless witnessed the interaction and just stood

3  by smiling and laughing at Hunter.  Esler Decl., Ex. 2 (Hunter Dep. at 81:15 – 85:10, 100:11-16).

4        Rohrer then told another officer to remove Hunter and told Hunter that he was terminated

5  from his position in Corrections Industries.  Hunter Decl. at ¶ 27; Esler Decl., Ex. 2 (Hunter Dep.

6  at 81:15 – 85:10).  Hunter informed Rohrer that he was going to file a grievance against him and

7  would be seeking a different job, and Rohrer responded, "I don't want your Black ass out here

8  anyway."  Hunter Decl. at ¶ 27; Esler Decl., Ex. 2 (Hunter Dep. at 81:15–85:10; 98:22–99:10);

9  Harris Decl., ¶ 7.  Later that day, Hunter was informed from his crew mates that he would be

10  returning to work in his normal role because Sherwood confirmed his food allergies.  Esler Decl.,

11  Ex. 2 (Hunter Dep. at 85:18–86:11).

12  **D.      ROHRER AND MCCANDLESS CONTINUE TARGETING HUNTER.**

13        On January 26, 2016, Hunter was authorized by Sherwood to be at the back of the kitchen

14  to deliver chemicals to Diane Krasowski ("Krasowski"), a correctional food service staff

15  member.  Hunter Decl. at ¶ 30; Esler Decl., Ex. 2 (Hunter Dep. at 71:23–72:20); Esler Decl.,

16  Ex. 6 (Denzer Dep. at 29:2 – 25).  This is a delivery the custodial crew makes daily.  Esler Decl.,

17  Ex. 2 (Hunter Dep. at 71:23–72:20).  While Hunter was making his delivery per routine, he

18  asked Krasowski to look into the issues he was having getting his special diet meal.  Esler Decl.,

19  Ex. 2 (Hunter Dep. at 74:22–75:5).  Hunter never knocked on Krasowski's door, he merely

20  waived at her and asked to talk to her, which she obliged.  Hunter Decl. at ¶ 30; Esler Decl.,

21  Ex. 2 (Hunter Dep. at 70:11–71:16).  A corrections officer was present but never told Hunter to

22  stop talking to Krasowski or to get back "in bounds."  Esler Decl., Ex. 2 (Hunter Dep. at 74:24–

23  75:13).

24        Soon after this encounter, Rohrer emailed Sherwood and Idso accusing Hunter of trying

25  to "manipulate staff to get what he wants," and suspended Hunter claiming that he was a security

26  issue.  Esler Decl., Ex. 2 (Hunter Dep. at 76:15–77:23); Esler Decl., Ex. 15 (DEFS 000739-740);

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 10

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1 Esler Decl., Ex. 16 (DEFS 001105-1107).  Rohrer encouraged the termination of Hunter stating

2 that "for security concerns he should not be in the hub at all."  Esler Decl., Ex. 2 (Hunter Dep. at

3 76:15–77:23); Esler Decl., Ex. 17 (DEFS 000692-694).  Because there were no records to

4 support such suspension or termination, the Facility Risk Management Team ("FRMT")

5 disagreed, and refused to suspend or terminate Hunter from his job. Esler Decl., Ex. 2 (Hunter

6 Dep. at 78:8–20); Ex. 6 (Denzer Dep. at 29:2 – 25).

7   During a separate custodial duty on January 26, 2016, Hunter was in the T Building.

8 Esler Decl., Ex. 2 (Hunter Dep. at 103: 25–105:4); Hunter Decl., ¶ 31, Ex. 13.  When he entered

9 the building, no one was there, so he went looking for someone.  Esler Decl., Ex. 2 (Hunter Dep.

10 at 103:25–105:7).  Hunter then saw Marsha McCormick ("McCormick"), the job coordinator,

11 and asked McCormick about the status of the Correction Industries chair shop ("CI Chair Shop")

12 program he was transferring into as a result of the constant harassment he was enduring from

13 Rohrer.  Esler Decl., Ex. 2 (Hunter Dep. at 111:13–112:1); Hunter Decl., ¶ 31.  McCormick

14 asked Hunter to come into her office and looked up the status of the new position to try to help

15 with the transition to the new role.  Esler Decl., Ex. 2 (Hunter Dep. at 106:25–107:15).  At no

16 point was Hunter out of bounds, as he had explicit permission to be in the T Building.  Hunter

17 Decl., ¶ 31.  But Rohrer used this to claim that Hunter was a security threat.  Esler Decl., Ex. 2

18 (Hunter Dep. at 105:16–106:3).  Once again, the FRMT investigated but found no cause for

19 suspending or terminating Hunter from his position or remove his HUB access based on this

20 conduct.  Esler Decl., Ex. 2 (Hunter Dep. at 113:6–18); Ex. 6 (Denzer Dep. at 33:2-22; 34:3-25;

21 35:3 – 36:12).

22   Hunter immediately reported these incidents to his counselors and the FRMT and then

23 drafted a letter to Gilbert dated January 26, 2016 for redress of his grievances. Esler Decl.,

24 Ex. 18 (DEFS 00894, 896, 898, 900).  Hunter's letter to Gilbert recounted that he was being

25 harassed and targeted because of his race.  Dkt. 34-1, Ex. 3.  On January 29, 2016, Hunter also

26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 11

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1  filed a racial discrimination grievance against Rohrer and McCandless through SCCC's offender

2  grievance program.  Hunter Decl. at ¶ 28, Ex. 10.

3  **E.    PRISON OFFICIALS FOUND NO SUPPORT FOR ROHRER'S ACCUSATIONS**

4  **AGAINST HUNTER.**

5          Hunter's counselor, Dennis Dahne ("Dahne") asked Rohrer for more information

6  regarding his claim that Hunter was a security risk, because Dahne was unable to find any record

7  that evidenced this conclusion.  Esler Decl., Ex. 19 (DEFS 000354-355).  Dahne informed

8  Rohrer that Hunter's infraction history was good and that work evaluations were above average.

9  *Id.*  In response, Rohrer confirmed that he never documented any of Hunter's conduct that

10  allegedly posed a security risk.  Esler Decl., Ex. 19 (DEFS 000354-355).

11         Dahne also emailed Sherwood, Hunter's manager, asking for more information to find

12  support for Rohrer's attempts to suspend and terminate Hunter.  Esler Decl., Ex. 20 (DEFS

13  000356-357).  Sherwood confirmed that Rohrer and McCandless had asked Sherwood why he

14  was only hiring Black inmates, and said that Rohrer said that Hunter was a security threat.  *Id.*

15  But neither Sherwood nor Jason Miller (the construction maintenance project supervisor who

16  oversaw the custodial crew) had any issues with Hunter when he worked on custodial.  Esler

17  Decl., Ex. 7 (Miller Dep. at 10:25–11:7); Esler Decl., Ex. 3 (Sherwood Dep. at 104:14–105:9).

18  In fact, both found Hunter to be a polite, good worker who did what he was told.  Esler Decl.,

19  Ex. 7 (Miller Dep. at 10:25–11:7); Esler Decl., Ex. 3 (Sherwood Dep. at 104:14–105:9).

20  **F.    ROHRER CONTINUES TO RETALIATE AGAINST HUNTER FOR FILING A**

    **GRIEVANCE AGAINST HIM.**

21         Because of the constant harassment from McCandless and Rohrer, Hunter switched jobs

22  to the CI Chair Shop on February 1, 2016. Esler Decl., Ex. 2 (Hunter Dep. at 114:5–10).  In early

23  April 2016, Rohrer approached Hunter there and told Hunter that he (Rohrer) was not happy

24  about the grievance he wrote and that Hunter should not be working in the CI Chair Shop.

25  Hunter Decl. at ¶ 37.  Hunter ignored Rohrer, which caused his supervisor in the CI Chair Shop,

26  Keith Morgan ("Morgan"), to ask him "What was that all about?"  *Id.*; Esler Decl., Ex. 2 (Hunter

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 12

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   Dep. at 114:8–115:6).  Hunter explained that Rohrer had been harassing him.  Esler Decl., Ex. 2

2   (Hunter Dep. at 114:8–115:21); Hunter Decl., ¶ 37.  In response, Morgan told Hunter that he

3   should not file grievances against staff, and that things would not have got as bad as they did had

4   he not filed the grievance.  Hunter Decl., ¶ 37.

5          On or about April 11, 2016, Morgan directed Hunter to report to a special visit with a

6   DOC investigator, who was investigating Hunter's claims.  Esler Decl., Ex. 2 (Hunter Dep. at

7   114:8–116:9); Hunter Decl., ¶ 38.  Hunter told Morgan that Hunter needed to grab his lunch and

8   take it with him because he had a special diet lunch and wasn't going to make it back before the

9   lunch room closed.  Esler Decl., Ex. 2 (Hunter Dep. at 114:8– 116:13); Hunter Decl., ¶ 38.

10  Hunter properly obtained permission from Morgan and was personally escorted with his lunch

11  under direct supervision by Officer Brule, a member of SCCC staff.  Hunter Decl., ¶ 38; Esler

12  Decl., Ex. 2 (Hunter Dep. at 114:8–117:16); Ex. 6 (Denzer Dep. at 33:2 – 22).

13         When Rohrer found out, Rohrer suspended Hunter for allegedly lying about having

14  permission to bring his lunch, despite the fact that it was commonplace for offenders to take their

15  lunch through the HUB.  Esler Decl., Ex. 2 (Hunter Dep. at 114:8–118:7), Esler Decl., Ex. 21

16  (DEFS 000746-750); Hunter Decl., ¶ 39.  Before April 11, 2016, Hunter had no problems in the

17  CI Chair Shop; in fact, Denzer noted in his email back to Rohrer that Hunter's time cards say his

18  work in the CI Chair Shop is superior.  Esler Decl., Ex. 22 (DEFS 000340-341).  Denzer later

19  confirmed in his deposition that he found no evidence that Hunter had acted improperly in taking

20  his lunch with him, and thought Rohrer was retaliating against Hunter.  Esler Decl., Ex. 6

21  (Denzer Dep. at 20:2 – 23:3; 34:3-25; 35:3 – 36:12).

22         On or around April 20, 2016,[4] Hunter filed a grievance in connection with this April 11,

23  2020 incident, reiterating Rohrer's continuous efforts to depict him as a security threat.  Hunter

24  Decl. at ¶ 38, 41, Ex. 15.  SCCC's own investigation confirmed that Hunter had obtained the

25

26  [4] This was the same day that Hunter switched back to working on Sherwood's custodial crew.  Hunter Decl., ¶ 3.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 13

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   proper permission to take his lunch from the CI Chair Shop to his interview. Esler Decl., Ex. 6

2   (Denzer Dep. at 20:2 – 23:3).  Sherwood said he would "hire [Hunter] back in a minute," as he

3   always maintained that Hunter was a great worker that could be trusted.  Esler Decl., Ex. 3

4   (Sherwood Dep. at 101:3–11; 106:22–107:11).

5          When Rohrer found out that Sherwood was hiring Hunter back on the custodial crew,

6   "the shit hit the fan," according to Sherwood.  Esler Decl., Ex. 3 (Sherwood Dep., at 104:14 –

7   106:10).  Rohrer approached Sherwood in anger asking him why he was hiring Hunter back on

8   his crew.  Esler Decl., Ex. 3 (Sherwood Dep. at 105:10–19).  He accused Sherwood of not being

9   "blue," meaning Sherwood was not backing up his fellow officers.  *Id.* at 105:10–106:2.  He also

10  sent an email to Sherwood, Denzer, and others making untrue claims about Hunter (i.e., that

11  Hunter was continuously lying to staff, having issues with his current supervisor, leaving the

12  HUB with contraband, etc.) in his ongoing attempts to frame Hunter as a security threat.  Esler

13  Decl., Ex. 23 (DEFS 000358-359).  In response to Rohrer's email, Idso informed Rohrer that

14  Hunter's OMNI records show no infractions related to his HUB employment and that there were

15  no behavior log entries that raised concern.  *Id.*, Esler Decl., Ex. 24 (DEFS 002149-2150).

16  **G.     HUNTER'S GRIEVANCES COULD NOT BE HANDLED BY THE GRIEVANCE**

17  **COORDINATOR AND WERE SENT DIRECTLY TO SUPERINTENDENT**
    **GILBERT FOR RESOLUTION, BUT GILBERT NEVER INFORMED HUNTER**

18  **OF THE OUTCOME.**

19         Hunter filed his grievances with the grievance coordinator, Dahne. *See* Hunter Decl.,

20  ¶¶ 28, 38, 41; Exs. 10, 15.  Dahne informed Hunter that he was not authorized to investigate

21  other staff members.  Esler Decl., Ex. 2 (Hunter Dep. at 157:3–25).  Per SCCC's grievance

22  policy, grievances filed related to employee conduct are to be sent directly to the superintendent

23  for review and investigation as a Level II grievance.  Esler Decl., Ex. 25, p. 17 (DEFS 000001-

24  33).  Hunter also filed a grievance directly with Superintendent Gilbert.  Dkt. 34-1, Ex. 3, at 10-

25  13.  When Gilbert finally responded to Hunter over two months later on April 12, 2016, she

26  informed Hunter that she would be investigating his claims further.  Esler Decl., Ex. 9 (DEFS

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 14

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   000307).  Hunter informed Dahne of her intent to investigate, and as a result, Hunter's

2   grievances would be handled by Gilbert, in line with SCCC policy.  Esler Decl., Ex. 2 (Hunter

3   Dep. at 157:9–158:7); Esler Decl., Ex. 26 (DEFS 000339).

4       Hunter cooperated in the investigation taken on by Gilbert and patiently awaited the

5   results.  Esler Decl., Ex. 2 (Hunter Dep. at 158:8–17).  After Hunter failed to receive any

6   information regarding the status of his grievance, he informed Dahne that he (Hunter) had not

7   heard anything.  *Id.*  Dahne told Hunter there was nothing he could do but wait.  *Id.* at 158:8–19.

8       Hunter continued to wait and still failed to receive any information regarding the

9   investigation so he approached Dahne a second time.  *Id.* at 158:8–22.  Hunter specifically asked

10  whether he could appeal the grievances to the next level. *Id.* at 158:8–24.  Dahne again told

11  Hunter "there is nothing you can do."  *Id.*  Dahne also informed Hunter that the matters were

12  now out of his hands.  *Id.* at 158:8–159:3.  Hunter also attempted to contact Gilbert, but Gilbert

13  failed to respond.  *Id.* at 158:8–159:23.  Gilbert's team never provided their investigation

14  findings to Hunter. Esler Decl., Ex. 2 (Hunter Dep. at 158:8–160:4).  In fact, Hunter did not

15  receive the findings or results from Gilbert's investigation until the State produced discovery in

16  this case. *Id.* at 158:8–161:10.

17  **H.    PROCEDURAL BACKGROUND**

18      Hunter filed his initial complaint pro se on about May 1, 2018.  Dkt. 3.  The State moved

19  for summary judgment on all claims (without arguing that Hunter had failed to exhaust his

20  grievances) on about February 25, 2019.  Dkt. 28.  Magistrate Judge Creatura issued a Report

21  and Recommendation on April 24, 2019 that recommended granting the State's motion for

22  summary judgment.  Dkt. 42.  On June 28, 2019, Judge Settle issued an Order noting possible

23  questions of fact regarding whether the custodial crew was the only crew with regular and

24  predictable access to the EFV units, as well whether there was selective enforcement of

25  regulations, and asked whether Hunter might benefit from appointment of pro bono counsel.

26  Dkt. 45.  After hearing back from Hunter, the Court entered an order on October 2, 2019

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 15

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   appointing Nick Valera[5] of the law firm Miller Nash Graham & Dunn, LLP as pro bono counsel

2   for Mr. Hunter.  Dkt. 51.

3          The Court thereafter declined to adopt the Report and Recommendations, denied the

4   State's motion for summary judgment without prejudice, and allowed the parties to conduct

5   further discovery.  Dkt. 55.  No trial date has been set.  Plaintiff Darrick Hunter is scheduled to

6   be released from prison in June of this year.  Hunter Decl., ¶ 1.

7                    **III. <u>ARGUMENT AND AUTHORITIES</u>**

8   **A.    SUMMARY JUDGMENT STANDARD**

9          Summary judgment is appropriate if no genuine dispute of material fact exists and the

10  moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Where reasonable

11  minds could differ, summary judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th

12  Cir. 1983).  Courts view the evidence in the light most favorable to the non-moving party and

13  draw all reasonable inferences in the non-movant's favor.  *Clicks Billiards Inc. v. Sixshooters

14  Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).  However, the District Court must decide the

15  exhaustion issue itself, even when facts are disputed.  *Albino*, 747 F.3d at 1170 – 1171.

16  **B.    HUNTER EXHAUSTED HIS CLAIMS THROUGH THE REMEDIES MADE
        AVAILABLE TO HIM.**

17

18         The Prison Litigation Reform Act ("PRLA") requires that prisoners exhaust available

19  administrative remedies before bringing an action in court. *Jones v. Bock*, 549 U.S. 199, 211

20  (2007). However, this "exhaustion requirement hinges on the 'availab[ility]' of administrative

21  remedies. . . ." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). Defendants have the burden to prove

22  a failure to exhaust.  *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).[6]  Defendants

23

24

_____

25  [5] Mr. Valera is on leave from his law firm to attend Judge Advocate General training; Mr. Esler is covering for Mr. Valera in Mr. Valera's absence.  Esler Decl., ¶ 1.

26  [6] Defendants did not argue exhaustion in their previous summary judgment motion.  Dkt. 28.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 16

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1    acknowledge that Hunter properly exhausted all remedies regarding the strip search claims, but

2    argue that is not so for his other claims.[7]  Defendants' Renewed Motion, at 8.

3         Hunter exhausted all his "available" remedies.  An administrative remedy is unavailable

4    when, despite what regulations or guidance materials may promise, it operates as a simple dead

5    end and officers are unable or consistently unwilling to provide any relief to aggrieved inmates.

6    *Ross*, 136 S. Ct. at 1859; *Id.* An administrative remedy is also unavailable when it is so opaque

7    that it becomes, practically speaking, incapable of use. *Id.* Further, "exhaustion is not required

8    when prison administrators thwart inmates from taking advantage of a grievance process through

9    machination, misrepresentation, or intimidation." *Id.* at 1860; *accord Albino*, 747 F.3d at 1177

10   (prisoner exhausted available remedies because jail officials misrepresented process).  A

11   prisoner's grievance only has to put prison officials on notice of the general nature of the claims.

12   *Griffin*, 557 F.3d at 1120.

13        SCCC's grievance coordinator, Dahne, told Hunter that Dahne was not authorized to

14   investigate employee conduct. Esler Decl., Ex. 2 (Hunter Dep. at 157:3 – 25). SCCC's grievance

15   policy requires the superintendent to handle such grievances as Level II grievances. Esler Decl.,

16   Ex. 25 (DEFS 000001-33).  Superintendent Gilbert did open an investigation.

17        On about May 3, 2016, Dahne met with Hunter about his grievances and Hunter

18   acknowledged that Gilbert was investigating his claims. Dkt. 77-6 at 2, 77-8, at 2; Esler Decl.,

19   Ex. 2 (Hunter Dep. at 157:3–158:7).  Hunter understood that Gilbert would take over and

20   investigate both the retaliation and racial discrimination claims that Dahne claimed he was

21   unauthorized to handle. Esler Decl., Ex. 2 (Hunter Dep. at 157:9–158:7); Esler Decl., Ex. 26

22   (DEFS 000339). Taking the facts in the light most favorable to Hunter, the "acceptable

23   resolution" referenced in Dahne's Level I response (Dkt. 77-6 at 2, 77-8, at 2) was Gilbert's

24

25   _____

26   [7] Hunter did not file any retaliation grievance against McCandless.  Dkt. 77-8, at 139.  Hunter's retaliation claim is against Rohrer alone for retaliating against Hunter for filing a grievance against Rorher.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 17

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1    ongoing investigation, which Hunter reasonably believed included all his claims relating to

2    discrimination and retaliation.

3         Despite inquiring numerous times thereafter about the status of Gilbert's investigation,

4    Hunter was never told the results of that investigation until they were produced in discovery in

5    this case.  When prison officials do not respond to a prisoner's initial grievance, administrative

6    remedies are exhausted. *Dole v. Chandler*, 438 F.3d 804, 809, 811 (7th Cir. 2006); *accord Sapp*

7    *v. Kimbrell*, 623 F.3d 813, 822-823 (9th Cir. 2010) (approving of *Dole*'s holding). Dahne assured

8    Hunter numerous times that Hunter had done all he needed to do and that "there were no further

9    avenues for appeal" (Hunter Decl., ¶ 47); even if Dahne was wrong, that still results in

10   exhaustion.  *Ross*, 136 S.Ct. at 1859; *Albino*, 747 F.3d at 1177.  Hunter exhausted his "available"

11   administrative remedies.[8]

12   **C.    GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER**
       **DEFENDANTS VIOLATED HUNTER'S EQUAL PROTECTION RIGHTS.**

13        "The Equal Protection Clause requires the State to treat all similarly situated people

14   equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008).  Even in the prison environment,

15   courts apply strict scrutiny to claims of race-based discrimination.  *Johnson v. California*, 543

16   U.S. 499, 505-506 (2005).  That scrutiny "requires the government to prove that the [challenged]

17   measures are narrowly tailored to further a compelling government interest." *Harrington v.*

18   *Scribner*, 785 F.3d 1299, 1306 (9th Cir. 2015).

19        When a plaintiff alleges race-based discrimination, intentional discrimination means that

20   a defendant acted at least in part because of the plaintiff's race. *Harrington v. Scribner*, 785 F.3d

21   1299, 1305 (9th Cir. 2015).v In the equal protection context, a plaintiff does not need to prove

22   discriminatory intent by direct evidence. *Lowe v. City of Monrovia*, 775 F.2d 998, 1011 (9th Cir.

23

24   [8] Admittedly, Hunter did not grieve the incidents when he was singled out for having fingerless gloves (even though
       white workers used the same fingerless gloves), or where his all-Black crew had their sunglasses confiscated even
       though other crews continued to use similar glasses, or the fact that his crew alone had to wear safety vests in the

25   HUB.  Hunter Decl., ¶¶ 44-45; *accord* Harris Decl., ¶ 10; Tremble Decl., ¶ 11.  However, those incidents should be
       considered as further evidence of Rohrer's and McCandless's animus toward, and disparate treatment of, Hunter and

26   his black crewmates, as well as further evidence of Rohrer's retaliation against Hunter.

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   1985), *as amended*, 784 F.2d 1407 (9th Cir. 1986).  Where the challenged policy is "facially

2   neutral," proof of its "disproportionate impact on an identifiable group can satisfy the intent

3   requirement" if it "tends to show that some invidious or discriminatory purpose underlies the

4   policy." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).  A plaintiff's "burden to

5   raise a triable issue of pretext is hardly an onerous one." *Earl v. Nielsen Media Research, Inc.*,

6   658 F.3d 1108, 1113 (9th Cir. 2011) (internal citations and quotation marks omitted).  Further,

7   the Ninth Circuit has "repeatedly held that it should not take much for a plaintiff in a

8   discrimination case to overcome a summary judgment motion." *France v. Johnson*, 795 F.3d

9   1170, 1175 (9th Cir. 2015).  "This is because the ultimate question is one that can only be

10  resolved through a searching inquiry—one that is most appropriately conducted by a factfinder,

11  upon a full record." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th

12  Cir. 2000).

13      1.   <u>Rohrer Instituted a Policy of Strip Searching the Only All-Black Crew Even
            Though Other Crews Had Equal or Greater Access to EFVs.</u>

14

15          Defendants do not seem to dispute that (1) the alleged problem of custodial crews

16  smuggling in contraband occurred prior to Sherwood becoming custodial supervisor in July 2014

17  and (2) at the time (i.e., July 2014), no black inmates were working in the HUB.  Rohrer did not

18  implement the custodial crew strip search policy until November 4, 2014 (Dkt. 31-1, at 4) – a

19  little over two weeks after Sherwood hired another black inmate to work on his custodial crew,

20  and seemingly many months after the previous problem with contraband ended.  Esler Decl., Ex.

21  10 (Sherwood Dep., Ex. 3).

22          Defendants argue that the custodial crew was unique because no other crew had similar

23  access to the EFVs.  However, the State's own records show that multiple other facility

24  maintenance crews entered the EFVs regularly and sometimes more often than the custodial

25  crew. Dkt. 75, Ex. 1.  Those records do not reflect all the work done at EFVs, and indeed exclude

26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 19

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1  "day to day sanitation or garbage pickup or other automatic tasks."  Dkt. 75, at 2, ¶ 6.  The State

2  admits that preventative maintenance on EFVs occurs on "regular intervals."  Dkt. 75, at 2, ¶ 4.

3       While the custodial crew entered the EFVs 60 times between the years of 2014 and

4  2016,[9] the construction maintenance crew entered the EFV Units 95 times during the same

5  period.  Esler Decl., Ex. 27 (DEFS 002896-2994); Hunter Decl. at ¶¶ 8, 20–21, Ex. 1.

6  Construction maintenance entered the EFVs more often than custodial because, aside from

7  entering the EFVs in response to a work order, they were responsible for a number of *regular*

8  EFV inspections, including monthly inspections of fire extinguishers and first aid kits and

9  quarterly inspections of the heat system.  *Id.* at ¶¶ 7, 8, Ex. 1.  Additionally, plumbing entered the

10 EFV Units 50 times during that same period.  *Id.* at ¶ 8, Ex. 1; ¶¶ 20–21.

11      Defendants state "predictability is a necessary prerequisite to the introduction of

12 contraband."  Renewed Motion at 13, ln. 19.  But as shown by the State's own records, the

13 construction crew also had predictable monthly inspection obligations. Hunter Decl. at ¶ 8, Ex. 1

14 (evidencing monthly, routine first aid kit checks and fire extinguisher checks).  Moreover, given

15 that the previous custodial crew member had already been caught introducing contraband (before

16 Sherwood became supervisor), it would become more likely that other crews would be used for

17 that purpose in the future.

18      Construction maintenance (among others) had the same routine access as custodial to the

19 EFV Units and posed the same security risks as the custodial crew, but there was one principal

20 difference between custodial and construction maintenance – the custodial crew was all-Black

21 While the crews were similarly-situated, only Hunter and his Black crewmates were strip

22 searched upon leaving the EFV Units.  Thus, Hunter's equal protection claim should stand.

23

24

25

26 ───────────────
[9] The strip search logs (Dkt. 76-1, Ex. 1) do not seem to show 60 such strip searches, again demonstrating that they are incomplete.  *See also* Esler Decl., Ex. 3 (Sherwood Dep. at 129:20 – 131:18); Ex. 28 (Sherwood Dep., Ex. 11).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 20

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

2.    Hunter Can Show that the Development and Implementation of the Custodial
Crew Strip Searches were a Pretext for Racial Discrimination.

On summary judgment, an equal protection plaintiff may show pretext by creating a triable issue of fact that either: (1) the proffered basis was objectively false; or (2) the Defendant actually acted based on an improper motive. *Patel v Penman*, 103 F.3d 868, 876 (9th Cir. 1996). The Defendants argue that they put the policy in place to remove security vulnerabilities that were unique to the custodial team. Renewed Motion at 16:13–21.  However, if Defendants wanted to remove security vulnerabilities, they would have implemented the policy against all inmates who accessed the EFV units.  Idso actually requested that type of policy, but defendant Rohrer instead took it upon himself to order strip searches of only the all-Black custodial crew. *Compare* Hunter Decl., Ex. 3 *with* Ex. 4.

As evidenced by Idso's initial email to Rohrer, the goal to eliminate the introduction of contraband was to be achieved through strip searches of any facility maintenance crew member ("porter") who worked in the EFV Units and left the direct line of sight of a supervisor.  Hunter Decl. at ¶ 10, Ex. 3.  This description encompasses crews other than just Hunter's custodial crew. Indeed, Captain Manio confirms that over the course of his nearly 20 year career at SCCC, "the EFV units have historically been an avenue by which incarcerated individuals introduce contraband into" SCCC.  Dkt. 73, ¶ 6.  Yet defendants did not introduce a strip search policy at all until shortly after Sherwood started hiring black custodial workers in the HUB for the first time; defendant Rohrer implemented that policy so that only the all-Black custodial crew would be strip searched.  That remarkable coincidence should be sufficient alone to allow Hunter's claims to go to the jury.

Rohrer was aware that the custodial crew was made up of all Black offenders, as evidenced by his questions to Sherwood asking "why are you hiring all these black guys?" Esler Decl., Ex. 3 (Sherwood Dep. at 58:15–19).  Rohrer developed the strip search policy after Sherwood hired his third black inmate to work on the custodial crew.  Rohrer's  comments as

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 21

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1 well as later conduct toward Hunter, including telling Hunter that Rohrer did not want Hunter's

2 "black ass" working in the HUB (Hunter Decl., ¶ 27), are evidence of his racial animus.

3 *Serrano*, 545 F.3d at 1082-1083.  A question of material fact exists as to whether Rohrer's strip

4 search was a pretext for racial discrimination.

5 **D.** **A GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER THE STRIP SEARCHES VIOLATE HUNTER'S FOURTH AMENDMENT RIGHTS.**

6

7  In *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), the

8 Supreme Court set forth a balancing test for determining a strip search's reasonableness:

9   "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search

10   entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is

11   conducted."

12 *Id*. at 559, 99 S.Ct. at 1884.

13  The strip searches carried out against Hunter and his custodial team members were

14 invasive strip searches that required the exposure of their genitals to SCCC staff.  Esler Decl.,

15 Ex. 14, § G (DEFS 000057-62).  Further, these searches violated SCCC policy.  SCCC had a

16 designated area at the HUB where inmates pass through to come back into the institution when

17 they have been out at the EFVs; by SCCC policy, this was the designated location at SCCC for

18 inmates to be strip searched. Esler Decl., Ex. 4 (Gilbert Dep. at 56:24–58:8); Hunter Decl., Ex. 5.

19 In violation of this policy, Hunter and his crew were strip searched inside the EFV Units. Esler

20 Decl., Ex. 2 (Hunter Dep. at 8:18–9:13).  The strip searches were also not documented properly.

21 Per SCCC policy, all strip search records must include at a minimum the date of the search, the

22 name of the offender, the offenders DOC number, the reason for the search, and the names and

23 genders of employees conducting the search.  Esler Decl., Ex. 14, § D (DEFS 000057-62). It is

24 apparent that many strip searches are missing.  Esler Decl., Ex. 3 (Sherwood Dep.; at 129:20 –

25 131:18); Ex. 5 (Rohrer Dep. at 197:2–198:7); Hunter Decl., ¶¶ 16-17. Sherwood also reported

26 that in many cases SCCC staff were not logging the strip searches of his custodial crew at all.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 22

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 / F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   Esler Decl., Ex. 3 (Sherwood Dep. at 127:1–4).  Indeed, the logs submitted seem only to show

2   Hunter being strip searched three times (on April 2, 2015, September 3, 2015, and September 30,

3   2015).  Dkt. 76, Ex. 1.  Hunter testifies that he was subjected to 25 or more strip searches.

4   Hunter Decl., ¶¶ 16-17.

5        Courts have held that when determining the reasonableness of strip searches, the presence

6   or absence of ready alternatives should be considered.  *Michenfelder v. Sumner,* 860 F.2d 328,

7   333 (9th Cir. 1988).  Here, SCCC has allegedly been experiencing contraband smuggling

8   through the EFVs for 20 years and had dealt with that problem without automatic strip searches

9   (Dkt. 73, ¶ 6); shortly after the first Black workers are hired in the HUB area, SCCC suddenly

10  implements a strip search policy of only that Black crew.  A genuine issue of material fact exists

11  as to whether the searches implemented were reasonable under the Fourth Amendment.

12  **E.     HUNTER'S RETALIATION CLAIMS ARE SUFFICIENT AND SUPPORTED.**

13       To prevail on a retaliation claim, a plaintiff must show that his protected conduct was

14  "the 'substantial' or 'motivating' factor" behind the Defendant's conduct. *Brodheim v. Cry*, 548

15  F.3d 1262, 1271 (9th Cir. 2009) (quoting *Soranno's Gasco, Inc. v Morgan*, 874 F.2d 1310, 1314

16  (9th Cir. 1989).  "Within the prison context, a viable claim of First Amendment retaliation entails

17  five basic elements: (1) An assertion that a state actor took some adverse action against an

18  inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the

19  inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a

20  legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).  Courts

21  can consider the timing of the actions in determining retaliatory intent. *Watison v. Carter*, 668

22  F.3d 1108, 1114 (9th Cir. 2012).

23       In addition to the false claims Rohrer made against Hunter, the multiple suspensions

24  Rohrer caused, and Rohrer's constant attempts at having Hunter terminated *after* Hunter told

25  Rohrer he was going to file a grievance against him and sue him, Rohrer also specifically told

26  Hunter that he was not happy about the grievance he wrote and that he should not be working in

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 23

4840-6849-9163.8

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1   the CI Chair Shop. Hunter Decl. at ¶ 37.  Additionally, when Hunter informed the chair shop

2   supervisor, Morgan, that Rohrer was giving him a hard time because he filed a grievance against

3   him, Morgan told Hunter that he should not file grievances against staff and that things would

4   not have been as bad as they were for him had he not filed the grievance. Esler Decl., Ex. 2

5   (Hunter Dep. at 114:8–115:21).  Even the grievance coordinator, Dahne, told Hunter that Rohrer

6   was not happy about the grievance Hunter had filed against him. *Id.* at 154:25–155:13.

7        Because there is additional evidence that demonstrates that Rohrer's conduct was

8   retaliatory, a genuine issue of material fact exists and Hunter's claim should stand.[10]

9   **F.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE**
10  **THEY COULD NOT HAVE REASONABLY BELIEVED THAT THEIR**
    **ACTIONS WERE LAWFUL.**

11       The right to be free from racial discrimination, even in the penological setting, has been

12  clear for over a decade, if not longer. *Johnson v. California*, 543 U.S. 499, 512, 125 S.Ct. 1141,

13  1150, 160 L.Ed.2d 949 (2005); *accord Harrington v. Scribner*, 785 F.3d 1299, 1305 (9th Cir.

14  2015).  Similarly, prisoners clearly have the right to file grievances and to be free from

15  retaliation for doing so. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).  Hunter has

16  shown sufficient facts that, when taken in the light most favorable to him, show violation of his

17  clearly established constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Defendants

18  are not entitled to qualified immunity.

19                     **IV. <u>CONCLUSION</u>**

20       Hunter agrees that his Eighth Amendment and Due Process claims may be dismissed, and

21  that he is not claiming retaliation against defendant McCandless.  Otherwise, the remainder of

22  his claims should proceed to a trial by jury.

23  / / /

24  / / /

25

26  _____

[10] Plaintiff agrees that his Eighth Amendment and Due Process claims should not proceed.

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1

2

DATED this 15th day of March, 2021.

3

                */s/ Brian W. Esler*
                Brian W. Esler, WSBA #22168

4

Nicholas A. Valera, WSBA #54220
Miller Nash Graham & Dunn LLP

5

Pier 70 – 2801 Alaska Way Suite 300
Seattle, WA 98121

6

(206) 624-8300
brian.esler@millernash.com

7

nicholas.valera@millernash.com

8

Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1

## <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on the date below, I served via email the foregoing document to the

3    following:

4          Cassie B. vanRoojen
           Katherine Joy Faber
5          ATTORNEY GENERAL'S OFFICE (40116-OLY)
           PO BOX 40116
6          OLYMPIA, WA 98504-0116
           360-586-1445
7          Email: CassieV@atg.wa.gov
           Email: Katie.Faber@atg.wa.gov
8
              Attorneys for Defendants
9

10         I declare under penalty of perjury under the laws of the State of Washington that the

11   foregoing is true and correct.

12         DATED this 15th day of March, at Seattle, Washington.

13

14                              */s/ Brian W. Esler*
                                Brian W. Esler

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE - 1
(CASE NO. C18-5198-BHS-JRC)

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4840-6849-9163.8