# EXHIBIT 1

**DECLARATION OF BRIAN W. ESLER**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____

DARRICK L. HUNTER,            )
                              )
        Plaintiff,            )
                              )
    vs.                       )    No. C18-5198-BHS-JRC
                              )
CHARLES N. ROHRER, et al.,    )
                              )
        Defendants.           )
                              )
_____

VIDEOCONFERENCE PROCEEDING
DEPOSITION UPON ORAL EXAMINATION OF
ED BALDWIN
NOVEMBER 13, 2020
PAGES 1 THROUGH 47
_____

Taken Before:

LAURA L. STEWART  CCR, RPR, CRR
CERTIFIED COURT REPORTER
#2110
OF
CAPITOL PACIFIC REPORTING, INC.
2401 BRISTOL COURT SW, SUITE C-103, OLYMPIA, WA 98502
TEL (360)352-2054 FAX (360)705-6539 TOLL FREE (800)407-0148

| TACOMA, WA | SEATTLE, WA | ABERDEEN, WA |
|---|---|---|
| (253)564-8494 | (206) 622-9919 | (360) 532-7445 |
| CHEHALIS | BREMERTON | |
| (800) 407-0148 | (800) 407-0148 | |

WWW.CAPITOLPACIFICREPORTING.COM
ADMIN@CAPITOLPACIFICREPORTING.COM

1

Baldwin - Examination by Mr. Valera

Page 5

1  deposition.
2      Because we're doing this over Zoom, I'm going to
3  ask that you answer audibly and speak loud enough so that
4  the microphone picks it up.
5      Also, let's please avoid speaking over each other.
6  I'll wait until you finish answering, and if you could
7  please wait until I finish asking a question.
8      If there's a question that you don't understand,
9  just ask me to rephrase it.  Remember that you are under
10 oath for the duration of this deposition.  It's the same
11 oath that you would take before a judge or a jury.
12 Understand that the testimony that you give today can be
13 used in a court proceeding and at trial.
14     Is there any reason that you cannot give truthful
15 testimony today?
16 A.  No.
17 Q.  Are you taking any medication that might affect your
18 memory or your judgment?
19 A.  No.
20 Q.  So for the duration of the deposition, counsel for the
21 AG may object to one of my questions.  Unless they direct
22 you not to answer a specific question, you're going to be
23 required to answer that question.
24 A.  Okay.
25 Q.  We can take a break at any time, if you need to.  Just

Page 6

1  let me know.  But just keep in mind that if I have asked you
2  a question, please answer that question before we go on
3  break.
4  A.  Okay.  I do have a question.
5  Q.  Sure.  Go ahead.
6  A.  About how long is this going to take?
7  Q.  I am hoping that it will not take longer than about an
8  hour and a half.
9  A.  Oh, wow.  Okay.
10 Q.  Any other questions?
11 A.  Nope.
12 Q.  Great.
13     Did you prepare for this deposition today?
14 A.  I did not.  I have no real idea what we're -- aside
15 from the person that we're discussing, I don't really know
16 what -- I'm not really clear why I would be asked.
17 Q.  Did you review any documents?
18 A.  I did not.
19 Q.  Okay.
20     Could you please tell me where you currently live,
21 as far as city goes?
22 A.  Aberdeen, Washington.
23 Q.  And do you still work at Stafford Creek Correctional?
24 A.  Yes.
25 Q.  How long have you been at Stafford Creek for?

Page 7

1  A.  Since May 1, 2015.
2  Q.  Did you work for the Department of Corrections before
3  Stafford Creek?
4  A.  No.
5  Q.  What is your role currently at Stafford Creek?
6  A.  My job title is Grounds and Nursery Specialist 5.
7  Q.  Have you had any other titles at Stafford Creek?
8  A.  No.
9  Q.  And can you describe your job responsibilities as the
10 grounds -- in the title that you gave me?
11 A.  Well, I manage a crew for ground maintenance tasks
12 and -- excuse me -- and gardening.  We do a variety of
13 things from mowing lawns.  I have some greenhouses that I
14 manage.  I train inmates to do gardening and horticulture
15 work.  We propagate the plants for the facility.  We have
16 vegetable gardens.
17     We grow food for food banks.  Coastal Harvest,
18 specifically.  We donate a pretty significant portion of
19 produce to the food bank distribution hub, which goes to an
20 eight-county area.
21     I do -- you know, any of the other -- I manage a
22 small engine repair shop for grounds crew.  I -- yeah.
23 Pretty much grounds and gardening.
24 Q.  And you mentioned that you manage a crew.  How many
25 inmates are on your crew?

Page 8

1  A.  I currently manage two crews.  I have a grounds -- what
2  they call a conservation nursery crew, which is anywhere
3  from 10 to 15 individuals, and then I -- there's currently
4  13, I believe, people on that crew.
5      And then I manage the life without parole garden
6  crew.  And that's anywhere from 5 to 10 worker gardeners
7  that I manage.  And currently, I believe there's 9 on that
8  crew.
9  Q.  For the conservation crew, how would you describe the
10 racial makeup of the crew?  Is it primarily white?  Is there
11 any primary race on that crew, or is it mixed?
12 A.  I would say it stays pretty mixed.  I would say for the
13 nature of the work that I do, I get a lot of white guys.
14 I've had a lot of Asian guys on the crew.  I've had a lot of
15 Latino guys on the crew.  Occasionally, I will have
16 African-Americans on the crew, also.
17     I would say since -- well, one of my tasks here, I
18 supervise a LGBTI support group for inmates.  And so as a
19 consequence of that activity, I end up with a large
20 percentage of -- of gay/transgender gardeners, also.
21     So I would say I'm probably the only crew that has
22 that population on my crew and in any significant amount.
23 I know that's not racially what you're asking, but it sure
24 is under the diversity category.  So I thought I would
25 volunteer that, also.

Baldwin - Examination by Mr. Valera

Page 9

1  Q. Thank you. That's helpful.
2     For the life without parole crew, what about that
3  crew?
4  A. I would say that is -- let me think. I've got
5  currently three guys who are African-American. I've
6  got -- I've got a guy who is Latino. I think the rest of
7  the guys are white, but I'm not sure. It might be four
8  African-Americans on the LWOP crew. One of the guys, I'm
9  not really sure. And I'm not going to say, "Hey, what race
10 are you?"
11 Q. I understand.
12 A. That would be not very good.
13 Q. No. I understand.
14    Would you say that generally, over the past --
15 since about 2015, has your crew generally been primarily
16 white, or have your crews been primarily white? Or at least
17 the majority, anyway?
18    MS. VANROOJEN: Object.
19    THE WITNESS: It really changes year by year.
20 There's been times where it has been. You know, they kind
21 of -- they kind of -- these guys like to work in groups, you
22 know.
23    So I'll get a group of Asian guys, and they'll be
24 friends. Then I'll get a group of African-American guys.
25 Then I'll get some white guys. I get a lot of the -- I also

Page 10

1  get a lot of the alternative religious types. The Wiccans
2  and the Druids and the -- which all have groups here. The
3  sweat lodge. The guys that go to the sweat lodge. I get a
4  lot of native guys also, I would say. Native American.
5     So, no, I would say my crew's pretty -- stays
6  pretty diverse.
7  BY MR. VALERA:
8  Q. Okay.
9  A. But I think I'm one of the supervisors that -- I don't
10 think everybody's open to that. So --
11 Q. Can you explain what you mean by that?
12 A. I would say a lot of the supervisors hire only white
13 guys.
14 Q. Would you say that generally, or are there specific
15 supervisors and specific areas that have that hiring
16 practice?
17    MS. VANROOJEN: Objection.
18    THE WITNESS: Huh?
19    MS. VANROOJEN: I said objection. Confusing.
20    THE WITNESS: Yeah. I'm not sure what that . . .
21 BY MR. VALERA:
22 Q. Are there specific supervisors that you can think of
23 that hire only white guys, in your opinion?
24 A. Yes.
25 Q. Do you know their names?

Page 11

1  A. Yes.
2  Q. Could you give me those names, please?
3  A. I would not.
4  Q. You're not going to give me their names?
5  A. I would not. I feel that if I were to give those
6  names, there would be retaliation, frankly.
7  Q. So I understand that, Mr. Baldwin. You did receive the
8  subpoena that we sent you; correct?
9  A. I -- I had, I think. Salina Brown took that.
10 Q. So I'm going to ask you to please provide me the names
11 of those people that you mentioned.
12 A. Well, let's just say they have never told me that,
13 specifically. I have just observed that that is something
14 that happens.
15 Q. Okay. We'll table that for now, but I'm probably going
16 to want to come back around to that point.
17    You are familiar with the hub area at Stafford
18 Creek?
19 A. Yes.
20 Q. Is your responsibility -- I guess is your garden crew
21 located within the hub?
22 A. The conservation nursery crew works in the hub. The
23 life without parole crew works not in the hub.
24 Q. I understand.
25    So not talking about the life without parole crew,

Page 12

1  talking about the conservation crew, they work in the hub;
2  correct?
3  A. Yes.
4  Q. Are you familiar with the EFVs or the extended family
5  visitor units in the hub?
6  A. Yes.
7  Q. Does your conservation crew work in that area?
8  A. Yes.
9  Q. Are you aware of the other work crews that do work in
10 that area?
11 A. Yes.
12 Q. Are you aware of the supervisors of the other work
13 crews who work in that area?
14 A. Yes.
15 Q. So you mentioned earlier that you felt like certain
16 supervisors have hiring practices where they prefer to hire
17 white crew members; correct?
18 A. Yes.
19 Q. Are --
20 A. That is my opinion, that there's a practice.
21 Q. Okay.
22    Do those other supervisors that have that practice
23 of preferring to hire white inmates work in the EFV area, as
24 well?
25 A. Yes.

3 (Pages 9 to 12)

Capitol Pacific Reporting, Inc. (360) 352-2054

Baldwin - Examination by Mr. Valera

Page 17

```
 1   much whenever they're going because, you know, they have gas
 2   in the mowers and that could be a security issue.
 3        So I think that every crew -- I'm pretty sure that
 4   every crew that goes to the EFV has to have -- you can't
 5   just send.  It's all locked.  So the supervisor has to
 6   unlock everything.  So they have to have escorts.
 7        The supervisors have to go to the EFVs with the
 8   crew, regardless of if they have a work order or not to do
 9   work.
10   Q.   So are you saying that it is logged whenever a crew
11   does perform work at the EFVs?
12   A.   Well, I don't log anything I do.
13        MS. VANROOJEN:  Objection.  Mischaracterizes
14   testimony.  Go ahead and answer, Mr. Baldwin.
15        THE WITNESS:  Oh, okay.  I don't have a log, and I
16   don't log anything.  In five years I've never been asked to
17   log anything.  So I'm going to figure that the only -- this
18   is just my guess.  Sort of my -- you know, based on what I
19   do.
20        But if I complete -- when I complete a work order,
21   I turn it in, and it's -- it's entered into the work order
22   system as completed.
23        So I think if there's a work order generated, there
24   would be a log.  That would be kind of a log.  But I don't
25   think, like, there's any logbook or any -- anything like
```

Page 18

```
 1   that.  No.
 2   BY MR. VALERA:
 3   Q.   Okay.
 4   A.   Not that I've ever been required to use.  And I've
 5   never heard of anybody else having to log stuff.
 6   Q.   Okay.
 7        Go back to --
 8   A.   Let's say I go -- I'm the light bulb guy, so I go and
 9   change out the light bulbs, and I had a work order for it.
10   I sign out the work order.  It took three light bulbs, cost
11   this much, took a half hour.  Sign it, date it, turn it in.
12   I think that's the only document for any work done in the --
13   around the facility, I'm guessing.
14   Q.   Okay.  Thank you.
15        Going back to the issue of hiring by supervisors in
16   the EFV, is it your observation that the majority of the
17   inmates that work in the EFVs are white?
18        MS. VANROOJEN:  Objection.  Confusing.
19        THE WITNESS:  Do you want me to answer it?
20   BY MR. VALERA:
21   Q.   Yes.  Please answer.
22   A.   I would say it varies.  It depends on which crew and
23   who the supervisor is and -- you know.  Yeah.  I guess it
24   would depend.  I would say -- I would say, based on my
25   observation, the majority of the workers in the hub are
```

Page 19

```
 1   white.
 2   Q.   Okay.
 3   A.   So I guess kind of by extension, yeah -- kind of, I
 4   guess you could say that.  But it's kind of a -- it's kind
 5   of misleading, I think, you know.
 6   Q.   Can you explain that, please?
 7   A.   Well, just because it depends on the crew.  Like, I
 8   know different crews are made up of different populations.
 9   And that changes, based on, you know, who is on your list.
10        I had a list of 12 guys to hire.  And if they're
11   all, you know, white, then that's what I hire.  And if
12   they're all LGBTI, which actually has happened, that's who I
13   hire.
14        I mean, I go with -- you know, I can't go around
15   and cherry-pick guys around the facility.  I mean, there is
16   a job coordinator that organizes who engineering and CI
17   hires, and then we do interviews.  You know, we get a list,
18   depending on, you know, who is interested in what jobs.
19        You know, they let these guys sign up for -- "Hey,
20   I'm in prison.  I want to learn how to be an electrician."
21   "I want to work in engineering."  "I want to sign up to work
22   in CI," and "I want to sign up to work at the unit."  And
23   then as jobs come up, I go on the call-out to those job
24   interviews.  Does that make sense?
25   Q.   That makes sense.  I don't think that I'm
```

Page 20

```
 1   understanding, then, your comment earlier about supervisors
 2   preferring to hire white inmates.
 3   A.   Well, I can say no.  Let's say I get 20 guys on my
 4   crew.  I pick who I hire.  So let's say if I get a really
 5   good mixture of -- a good racially mixed crew -- which I
 6   would say the job coordinator tends to -- you know, like
 7   this last time for me, as an example, getting all LGBTI --
 8   I think I had two guys out of 12 that were not.  But that's
 9   who was signing up to be on my crew.  So that -- that's what
10   I ended up with.
11        I think that that's unusual.  I don't think that
12   that always happens.  I think that -- you know, most people
13   just get the list that they get, and then they pick from
14   that list.
15        So let's say I got, you know, six purple guys and
16   20 -- six blue guys, and I only want to hire purple guys.  I
17   just don't hire the blue guys.  There's no -- nobody checks.
18   There's no quotas or anything like that happening for most
19   people.
20        But I can request -- I mean, if I am the job
21   coordinator, I can say, "Hey," you know, "can you put this
22   guy on my list?"  Or if I see a guy out in the facility
23   while I'm working that approaches me and says, "Hey, I want
24   to work on your crew," I will tell them -- and all the other
25   supervisors -- "talk to your supervisor.  It's conservation
```

Page 21

1  nursery.  Get on that list, and the next time they hire you,
2  if you're eligible for hub access and" -- you know, they
3  would have to jump through hoops to get hub access.  They
4  have to have their GED.
5       "If you qualify to work in the hub, you will come
6  up on that list."  I can't say, "Okay.  You look great.  I'm
7  going to hire you right now."  I can't do that.
8  Q.  Okay.  Thank you.
9  A.  So it's random for some people, and some people can, I
10 guess, work it more.  I mean, if I'm buddies with the job
11 coordinator, I can say, "Hey, I want these guys," and get
12 it, and chances are, that happens.
13 Q.  Thank you.
14      Do you have any recollection of Mr. Darrick Hunter?
15 A.  Yes.
16 Q.  Did you have any relationship with him?
17 A.  He was chatty.  So I would chat with him.  We were
18 professional and friendly.  We had a friendly interaction.
19 Generally, if somebody in custodial needed to do something
20 in my shop, he would come over and do it.  He's -- he was a
21 pretty good guy, I thought.
22      I would -- I would say -- I would give him
23 positive -- my recollections would be -- I would consider
24 them positive, I guess.
25 Q.  Do you know Mark Sherwood?

Page 22

1  A.  Yes.  He's one of my co-workers in engineering.
2  Q.  Do you recall any conversations that you had with
3  Mr. Sherwood about Mr. Hunter?
4  A.  Oh, boy.  Yeah.  I would say he was -- he was a source
5  of some conversation several years ago.
6  Q.  Do you recall what those conversations were about?
7  A.  I would say generally -- I can't really recall super
8  specific things on specific dates.  But I would say that --
9  as I recall, that Mr. Hunter was a pretty good worker for
10 Mr. Sherwood, overall.  But that he had some -- he
11 would -- he would get infracted a lot, as I recall, and
12 sometimes he'd lose his job.
13      And Mr. Sherwood would, like, hire him back a lot.
14 Which isn't usual.  That's not usually -- usually if
15 somebody gets fired off your crew, you're not going to be so
16 inclined to hire them back.  As I recall, that was something
17 that happened once or twice.
18      So we would discuss that.  And I would say that
19 Mr. Sherwood thought that Mr. Hunter was treated unfairly.
20 So we -- we had had some of those conversations, I would
21 say.  I seem to recall that a few times being discussed.
22 Q.  Can you expand on those conversations about Mr. Hunter
23 being treated unfairly?  What you recall from those?
24 A.  You know, man, I just -- not really.  Like things --
25 like Mr. Sherwood would say that different officers were

Page 23

1  trying to have them do additional things.  Well -- in the
2  EFVs, for instance.  Or that he felt like certain people had
3  targeted certain people on his crew.
4       He seemed frustrated because there was some
5  conversation in the department that maybe he was
6  compromised, because at a certain point, he had hired all
7  black guys on his crew, and that there was a gang
8  affiliation or compromise.  And he seemed pretty upset when
9  those things were said.
10      And as he's a friend -- I would call Mark a pretty
11 good guy.  We've been really friendly and have a good
12 working relationship.  And, you know, I think he's good at
13 what he does.  And I -- so I think I was a good sounding
14 board for him when he would have those discussions when he
15 was frustrated because I -- I didn't ever -- I did not
16 believe any of the accusations that were ever made against
17 him for having an all-black crew, which I thought was weird.
18 It's just how sometimes people are in our department and
19 this facility.  I hate to say it, but . . .
20 Q.  Could you expand on that?
21 A.  Well, prison's not a nice place to work all the time.
22 Some of the people that work here aren't really nice.  And
23 it's pretty much just that simple.  And you have to have a
24 tough skin.  And I would say Mark Sherwood is not very
25 tough-skinned.

Page 24

1       So he was -- he would -- he would -- I would say he
2  would fret a lot over other people's opinions and his
3  reputation.  He was very concerned what people thought about
4  him and how they perceived his job performance.
5       And work -- he was a hard worker.  He worked really
6  hard.  He was a good -- I mean, I wouldn't say he was
7  fretting for no reason.  He deserved a lot more credit than
8  I think he got.
9  Q.  Do you know Timothy McCandless?
10 A.  Yes.
11 Q.  Did you have a relationship with him?
12 A.  We are professional.  We work together.  He's tool
13 control sergeant.  So I've had to work with him on things of
14 getting tools to the housing units for their gardens or tool
15 repairs.  He does all the tool accountability stuff.
16 So -- yeah.  I would say he's a pretty prominent feature in
17 our department.
18 Q.  Have you had any negative experiences with
19 Mr. McCandless?
20 A.  I would say yes.
21 Q.  Very generally, can you tell me about those
22 experiences?
23 A.  I would say that Mr. McCandless -- it's my impression
24 of him that he would use policies to get people, kind of.
25 If he didn't like you, then you were kind of on the outs,

Page 25

1  and he seemed to be kind of part of the -- the white
2  supremacy set, honestly.
3       So -- with the makeup of my crew, he's not always
4  very positive towards me either.  And he definitely was not
5  very positive towards Mr. Sherwood.  And I would say that at
6  times he -- sometimes he seems kind of moody.  Sometimes
7  he's very helpful.  And sometimes he's not very helpful.
8       Like, he goes out of his way to be sabotaging, if
9  he doesn't like you.  So I -- I would say that he is a
10 person I have some frustrating interactions with.
11 Q.  Do you ever recall discussing Mr. McCandless with
12 Mr. Sherwood?
13 A.  Yes.
14 Q.  Do you recall what those conversations were about?
15 A.  I would say that they fall under the same general
16 headings that I have described.  Just generally when people
17 are saying that somebody's compromised or that somebody has
18 questions about a person's affiliation at work because of
19 the makeup of their crew.
20      I would say that McCandless would come up often in
21 those conversations that I had with Mark Sherwood.  And, you
22 know, frustration -- him feeling frustration about some of
23 his situations.  And I would -- I would vent some of my
24 frustrations to Mr. Sherwood, as well.
25 Q.  Do you recall if you ever discussed Mr. McCandless'

Page 26

1  treatment of Mr. Hunter with Mr. Sherwood?
2  A.  Generally, I would say -- wait.  McCandless' discussion
3  of Hunter with -- with Mr. Sherwood?
4  Q.  If you ever discussed with Mr. Sherwood McCandless'
5  treatment of Mr. Hunter.
6  A.  Yes.
7  Q.  Do you recall how that conversation went?
8  A.  I would say it was generally Mr. Sherwood's opinion
9  that -- that Tim McCandless did not like Hunter and had him
10 on his -- in his target.
11 Q.  You mentioned it was your opinion that Mr. McCandless
12 was of the white supremacist subset or set?
13 A.  Yes.
14 Q.  Can you elaborate on what you mean by that?
15 A.  Well, just generally, you know, I guess -- just, you
16 know, things he says.  The way he acts.  The people he
17 associates with.  The things he's said to me about my crew
18 in the past.  The things that Mr. Sherwood has reported that
19 he said to him about his crew.  Things that Tim McCandless
20 has said to me about Mark Sherwood's crew.  I mean, he's
21 pretty open, I would say, about it.
22 Q.  Can you tell me what Mr. McCandless said to you about
23 Mr. Sherwood's crew?
24 A.  He just one time said -- when I was new -- Tim had
25 asked, you know, "How's it going?"  The new guy.

Page 27

1  Generally -- general terms.  I don't remember if there was
2  anybody else -- it was in the tool crib.  You know, "How's
3  it going?"  I said, "Oh, great.  People are really helpful."
4       And I said something like, you know, "Especially
5  Mark Sherwood has been really showing me a lot of stuff."
6  And he goes, "Oh, Mark.  Oh, Mark Sherwood.  He's" -- "you
7  got to watch out for that guy.  He's" -- "we think that he's
8  compromised, but we haven't decided to what degree."
9       And I was, like, new.  I mean, "What do you mean,
10 he's compromised?"  "Well, I mean, we noticed he's hired an
11 all-black crew."  And I go -- I mean, to me, that's, like,
12 why don't -- "I'm still not getting your gist here.  I mean,
13 I don't" -- and he kind of dropped it at that point, because
14 I think he realized that I wasn't -- I wasn't in the club,
15 so to speak.  So --
16 Q.  Do you recall Mr. McCandless saying anything else or
17 making any other comments about the race of Mr. Sherwood's
18 crew?
19 A.  I -- it was just so long ago.  I would say, I don't
20 know.  It was 2015, 2016.  I think that -- I heard more
21 about it when he wasn't around than when he was around
22 from -- random people seemed to -- it seemed to be a source
23 of conversation.
24 Q.  You say that conversation occurred in the tool crib;
25 correct?

Page 28

1  A.  Yes.  As I -- I believe that's where we talked about
2  it.  And he -- -- I went and talked to my supervisor,
3  because I was very concerned.  I was, like, "Wow.  Check out
4  what happened.  So this just happened."
5       And so I don't remember if my supervisor mentioned
6  it to Mark or I mentioned it to Mark.  But then we talked
7  about it a lot.  And it was, like -- I mean, that was a
8  mistake, because Mark got really -- pretty worked up over it
9  at that point.  And that seemed to justify his opinion that
10 he was targeted by people in our department.  Anyway . . .
11 Q.  Who was your supervisor at that time?
12 A.  Jason Miller.
13 Q.  Was anyone else present with you and Mr. McCandless
14 when he made those comments in the tool crib?
15 A.  I cannot recall if Sergeant Rohrer was there or not.
16 But I think he was.  Or maybe outside.  He had mentioned the
17 same thing to me.  Because I remember having a similar
18 conversation with Charles Rohrer about Mark Sherwood being
19 compromised, but we don't know to what degree.
20      They were pretty open about it.  It wasn't a
21 big -- I mean, the reason people were talking about it is
22 because they weren't, like -- they were pretty open about
23 it.
24 Q.  Would you say that they were open about making comments
25 about Mr. Sherwood's crew's race?

Page 29

1   MS. VANROOJEN: Objection. Mischaracterizes the
2   testimony.
3   BY MR. VALERA:
4   Q.  Mr. Baldwin, I'll restate that question.
5       Is it correct that you said that Mr. McCandless
6   made comments to you about the race of Mr. Sherwood's crew?
7   A.  Well, that seemed to be the basis of the objection.  I
8   mean, that Mark Sherwood was compromised, was because he had
9   an all-black crew.
10      I mean, that was, like, the foundation of the
11  argument that he was making to get to Mark Sherwood, I would
12  say.  The fact that the crew was black.  Everybody on his
13  crew was African-American, and that was the -- that was the
14  foundation of the accusation that he was compromised.
15      I mean, it was like, sort of, a, "Well, duh,
16  doesn't everybody see it that way?" kind of thing.  When I
17  didn't, I was kind of -- then we didn't -- he didn't
18  really -- then it just went back to just -- everything was
19  very professional between me and McCandless.  And me and
20  Rohrer, actually, at that point.
21  Q.  Okay.
22      You said that that conversation happened
23  approximately in 2015, when you began working at Stafford
24  Creek?
25  A.  Yeah.  It was pretty early on.  I was pretty much out

Page 30

1   of -- was kind of learning stuff.  So, yeah, it would have
2   been 2015 or maybe early 2016, as I -- but I'm not positive
3   about the time frame.  I'm sorry about that.  I never
4   documented any of these conversations.  And I apologize for
5   that.  But . . .
6   Q.  Do you recall the statements that Mr. McCandless made
7   to you about your crew?
8   A.  Oh, he tried to say -- I mean, he would do the same
9   thing.  I mean, you know, how does it look that I have an
10  all-LGBTI crew?  He seemed to make those kind of statements.
11  But I don't think people took it very seriously at that
12  point.
13      I think that -- I had established a reputation as
14  being fairly outspoken and, you know, willing to defend
15  myself, and so it didn't go very far.  But I did get a bunch
16  of attention from the PREA coordinator, and I did get -- he
17  did attempt to harass -- because, you know, I have these
18  hoop houses, and this year we changed what we're doing.
19      So, you know, I want to grow as much produce as we
20  can.  So we were growing a lot of weather-sensitive plants
21  that don't grow here on the coast.  Like tomatoes and
22  peppers, melons.  And, you know, some of that stuff gets
23  viney and can get overgrown.
24      And she seemed very fixated on the hoop houses that
25  had LGBTI individuals working.  And he didn't seem at all

Page 31

1   fixated on the ones that had the straight guys, that were
2   saying -- it was all the same thing.  Sorry.  It was -- it
3   just was obvious that he wanted to harass certain members of
4   my crew and not others, and wanted to attempt to hold me
5   accountable.
6       And at that point, I had been in to Mark, "Hey,
7   well it looks like it's my turn on that," you know.  But it
8   didn't -- it didn't go very far.  I mean, it sure didn't go
9   very far.
10      So -- and then it just -- I think it got dropped.
11  Because I kind of made some -- you know, I kind of made some
12  legal noises.  "Hey, if I need to lawyer up about this,
13  that's where I'll go, because I ain't taking your shit."
14  Excuse my French.  But I was not happy to get that kind of
15  harassment.
16      And then it just sort of -- I don't know.  It just
17  sort of -- I don't know if it went away or not, actually.
18  I'm still kind of waiting for something to come up around
19  me, honestly.
20      I just think that's part of the culture that we
21  live in here, and it's kind of what makes this job hard
22  sometimes.  It's not a very nice place all the time.
23  Q.  Yeah.
24      Could you expand on that "being part of the
25  culture"?  I'm still not quite tracking what you mean by

Page 32

1   that.
2   A.  Well, just -- it's -- this is just my opinion.  But
3   sometimes it seems like people that work here are here to --
4   want to really help people.  You know, I've worked in a lot
5   of institutions.  I worked at an acute care psychiatric
6   facility, and I worked at a med/surg unit in a hospital.  I
7   worked in a hospice.
8       I tend to approach my job in those terms of, you
9   know, I'm here to work with the population that can't meet
10  their needs a hundred percent, for whatever reason.  In this
11  case, because they're incarcerated.
12      I don't -- I think that other people that come
13  from -- come from a law enforcement background -- I think
14  there's some of that, you know -- the good civil servant,
15  the helpful.  You know, we want to help the program and
16  learn new things and get new opportunities.
17      And then I would say there's another group that are
18  working here because they're bullies, and they want to bully
19  somebody, and they pretty much think that, you know, inmates
20  deserve to be here.  And, in fact, that it might be part of
21  their job to make it worse for them.
22      And I see a lot of -- I'll just be honest.  I see a
23  lot of those types of people.  They utilize policy -- they
24  twist policy around to their benefit.  And so I think that
25  there's a culture of that.

Page 33

1       I mean, I hate to say it, but I feel like it's
2  something that I deal with every day.  It's something that
3  people here deal with every day.  And I'm just very thankful
4  that it's not the majority of people who work here.  But,
5  you know, it creates a culture, I think, that -- and also,
6  additionally, I think that sometimes when the people work
7  here, they want to help people.
8       They get very burned out, because the population is
9  very jaded.  And I think that sometimes they see people that
10 want to help as targets.  And I think that that does
11 create -- I do see people get compromised and kind of do
12 questionable things because, you know, they just kind of end
13 up there.  So that tends to feed some of the more negative
14 aspects of the culturing.
15      Because, "See, see, told you.  There it is right
16 there.  That's it.  That's what we're" -- that's all we're
17 saying all this time.  And so I feel like sometimes -- from
18 a cultural standpoint -- that we chase our tail a lot,
19 honestly.
20      I mean, I think that -- because, I mean, it's --
21 again, it's prison.  It's not a nice place to work all the
22 time.  And that is sometimes reflected in -- in the culture.
23 Not with just the inmates, but sometimes with staff.
24 Q.  Understood.  Thank you.
25      You mentioned Charles Rohrer earlier.  Do you have

Page 34

1  a relationship, or did you have a relationship with
2  Mr. Rohrer?
3  A.  I would say professional.  I would say that he was
4  always friendly, and I didn't interact with him too much
5  because he was kind of more over -- in charge of the hub
6  area.
7  Q.  Do you recall having any conversations with
8  Mr. Sherwood about Mr. Rohrer?
9  A.  Similar things.  Yes.
10 Q.  Do you recall those conversations?
11 A.  They would -- I would say -- I can't specifically
12 recall any conversations that we had.  But it was the same
13 thing.  He -- they were partners.  Rohrer and McCandless
14 were kind of partners.  They kind of had some of the same
15 views and some of the same MO, I would say.
16 Q.  Can you expand on what you think their views were?
17 A.  Well, just --
18      MS. VANROOJEN:  Objection.
19      THE WITNESS:  I would just say that they were very
20 vigilant about staff getting compromised, and maybe
21 sometimes that some of their views on other things, like
22 race relations or, you know, diversity, weren't -- weren't
23 really very moderate or maybe even not very appropriate.
24 BY MR. VALERA:
25 Q.  Earlier you mentioned that Rohrer may have made a

Page 35

1  statement to you about Mr. Sherwood's crew's race.
2       Do you recall Mr. Rohrer ever making any other
3  statements about race, in general?
4  A.  No.  I wouldn't say -- he was always pretty friendly.
5  Just quick -- quick, clever, friendly banter.  Not really
6  anything too heavy.  He seemed a little more consistent.
7  His professional persona was very consistent in his work.  I
8  would say that -- that -- yeah.  I would say probably less
9  so.
10 Q.  Would you describe Mr. Rohrer as a part of that same
11 white supremacist set you mentioned Mr. McCandless being a
12 part of?
13      MS. VANROOJEN:  Objection.
14 BY MR. VALERA:
15 Q.  Please answer the question, Mr. Baldwin.
16 A.  Oh, you want an answer?  I would say that he probably
17 held some of the same views, just based on the -- the
18 conversation about Mark Sherwood's -- Mark Sherwood being
19 compromised.  Which -- I mean, I want to be clear.  I
20 thought that was a ridiculous thing to allege against Mark
21 Sherwood.
22      I thought it was so far off base, and the more that
23 I talk about it, it kind of brings up some emotion for me
24 because, you know, I really think Mark Sherwood's a good guy
25 and works hard to do a good job.  And I just -- I'm pretty

Page 36

1  sure that Rohrer picked up that when we had our
2  original -- and we never -- I don't think -- to my
3  knowledge, I don't remember having any other kind of
4  interactions like that with him.  He never addressed me
5  about -- if he wanted to address me about something I was
6  doing, he would go to my supervisor.
7  Q.  You are talking about Rohrer?
8  A.  Rohrer.  Yeah.
9  Q.  So after thinking about Mr. Rohrer's accusations about
10 Mr. Sherwood, are you able to remember anything else about
11 that conversation where Mr. Rohrer mentioned the race of
12 Mr. Sherwood's crew to you?
13 A.  Nope.  I cannot remember anything else about it.  It
14 was a very long time ago.  And really, how I remember it
15 is -- I'll be honest -- from the emotional -- how it
16 affected me.
17      I don't remember -- you know, and then he said --
18 I mean, you know, I couldn't quote specifically statements
19 at this point.  Like I said, I didn't document it.  It's
20 just very -- it just was something that just went around for
21 a while, actually.  Yeah.
22      And it just -- you know, I would say a lot of
23 people talk about it, and it just really -- didn't really go
24 anywhere.  And --
25 Q.  I'm sorry, Mr. Baldwin, to interrupt you.  I'm not

Electronically signed by Laura Stewart (001-349-646-8261)                    daf3e5fd-f6e1-4f21-80ec-39913fa8e2b9

```
 1                    C E R T I F I C A T E
 2           I, LAURA L. STEWART, Certified Court Reporter in
 3   and for the State of Washington, residing at Graham, do
 4   hereby certify;
 5           That the foregoing proceedings were taken before me
 6   and thereafter reduced to a typed format under my direction;
 7   that the transcript is a full, true and complete transcript
 8   of said proceedings consisting of pages 1 through 47;
 9           That as a CCR in this state, I am bound by the
10   Rules of Conduct as Codified in WAC 308-14-130; that court
11   reporting arrangements and fees in this case are offered to
12   all parties on equal terms.
13           That I am not a relative, employee, attorney or
14   counsel of any party to this action, or relative or employee
15   of any such attorney or counsel, and I am not financially
16   interested in the said action or the outcome thereof;
17           That upon completion of signature, if required, the
18   original transcript will be securely sealed and the same
19   served upon the appropriate party.
20           IN WITNESS WHEREOF, I have hereunto set my hand
21   this 23rs day of November, 2020.
22
23           _____
             Laura L. Stewart   CCR No. 2110
24
25
```

47