UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DARRICK L. HUNTER,

               Plaintiff,

    v.

CHARLES N. ROHRER, *et al.*,

               Defendants.

CASE NO. 3:18-cv-05198-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR: May 7, 2021

This 42 U.S.C. § 1983 civil rights action is before the Court on referral from the District Court under 28 U.S.C. § 636(b)(1)(A)–(B) and local Magistrate Judge Rules 1, 3, and 4. *See* Dkt. 55.

Plaintiff, a prisoner in the custody of the Washington State Department of Corrections ("DOC"), brings claims arising from his incarceration at Stafford Creek Corrections Center ("SCCC"). He sues Charles Rohrer and Timothy McCandless, who are both SCCC sergeants, and an SCCC superintendent, Margaret Gilbert. Plaintiff alleges that Rohrer and McCandless were upset when SCCC custodial crew supervisor Mark Sherwood began hiring "primarily

1   black" offenders (Dkt. 67, at 3) and that Rohrer then implemented a strip search policy that

2   targeted only the custodial crew at SCCC, that Rohrer and McCandless discriminated against

3   plaintiff and the custodial crew on the basis of race, and that Rohrer retaliated against plaintiff

4   when he protested the discriminatory treatment.  *See* Dkt. 67.  Plaintiff brings claims of

5   retaliation and violation of the Fourth and Eighth Amendments, Due Process, and Equal

6   Protection.

7           Defendants have moved for summary judgment dismissal of these claims.  Dkt. 72.  The

8   motion should be granted in part and denied in part.  Specifically, the Court should accept

9   plaintiff's concession that all claims against Gilbert should be dismissed, as well as his claims for

10  violation of the Eighth Amendment and Due Process.  *See* Dkt. 81; Dkt. 82, at 24 n.10.  The

11  Court should also accept plaintiff's narrowing of his claims against McCandless to solely a claim

12  for violation of Equal Protection and the Fourth Amendment.  *See* Dkt. 82, at 17 n.7 & 18 n.8.

13          However, the Court should deny defendants' request for summary judgment dismissal of

14  the Equal Protection, Fourth Amendment, and retaliation claims against Rohrer.  First, contrary

15  to defendants' argument, plaintiff has exhausted his claims.   Second, and relevant to his Equal

16  Protection claims, plaintiff has raised triable issues of fact regarding whether other, similarly

17  situated groups—that is, white crews who worked in the same areas as the custodial crew—were

18  not strip searched and has provided evidence supporting the conclusion that racial animus

19  motivated Rohrer.  Third, and relevant to his Fourth Amendment claim, plaintiff has come

20  forward with evidence to support the conclusion that Rohrer directed strip searches based on

21  racial animus and that these strip searches did not comply with prison and DOC policies.

22  Finally, regarding retaliation, plaintiff has come forward with evidence that Rohrer abused prison

23  policy in order to retaliate against plaintiff by having him labelled a security threat and

24

1  terminated him from his job.  Therefore, plaintiff's retaliation claim also survives summary

2  judgment.

3      As for the claims against McCandless, plaintiff has provided evidence that racial animus

4  motivated McCandless to confiscate equipment from the custodial crew, but not other, white

5  crews of prisoners, but plaintiff has failed to show that McCandless participated in the strip

6  search policy.  Therefore, the Equal Protection claim against McCandless should proceed, but the

7  Fourth Amendment claim should be dismissed with prejudice.

8                          **BACKGROUND**

9  **I. Proceedings to Date and Allegations of Operative Complaint**

10     Plaintiff, acting *pro se*, brought suit in this Court in March 2018.  *See* Dkt. 1.  The Court

11  directed service of the complaint and, in April 2019, recommended granting defendants'

12  summary judgment motion and dismissing plaintiff's claims.  *See* Dkt. 42, at 2.  However, the

13  District Court appointed counsel for plaintiff (Dkt. 51) and, in December 2019, the District

14  Court, upon receipt of a joint status report from the parties, re-opened discovery.  Dkt. 55, at 2.

15  Thereafter, the District Court declined to adopt the Report and Recommendation and referred the

16  matter for further discovery and dispositive motions.  Dkt. 55, at 2.

17     With the benefit of counsel, plaintiff filed the operative complaint.  Dkt. 67.  He alleges

18  that Rohrer and McCandless were upset when supervisor Sherwood began hiring primarily black

19  offenders onto the custodial crew in the engineering section of the SCCC "HUB" area and that

20  Rohrer initiated a strip search procedure as pretext for racial discrimination against the custodial

21  crew.  *See* Dkt. 67, at 3–4.  Plaintiff alleges that Rohrer used the guise of addressing security

22  breaches in the Extended Family Visit ("EFV") area of the HUB that the custodial crew cleaned

23  to justify the strip search policy—even though "[n]one of Sherwood's custodial crew members

24

REPORT AND RECOMMENDATION - 3

1   were implicated in the former security breaches that Rohrer's strip search[es] were meant to

2   address." *See* Dkt. 67, at 3–4.  Plaintiff alleges that this strip search policy was administered, at

3   Rohrer's direction, in a racially disparate and demeaning manner and in violation of DOC policy.

4   *See* Dkt. 67, at 3–11.  Moreover, other offender crews who worked in the EFV area and who

5   consisted of "mostly white and non-black offenders" were not subjected to strip searches.  Dkt.

6   67, at 3–4.

7           Plaintiff also alleges that he threatened to file—and later filed—grievances protesting

8   Rohrer's actions and that as a result, Rohrer retaliated against him, including attempting to have

9   plaintiff suspended from his job on the custodial crew (and later, his job in the chair shop),

10  labelling him a "security threat," and harassing him.  *See* Dkt. 67, at 6–9.  Plaintiff also alleges

11  that McCandless shared Rohrer's racial animus toward Rohrer and the custodial crew and, as a

12  result, confiscated their gloves and safety glasses.  *See* Dkt. 67, at 9; *see also* Dkt. 86-3, at 8

13  (claiming that Rohrer required only the custodial crew to wear vests).  Plaintiff clarifies in his

14  response to summary judgment that these allegations are evidence of Rohrer and McCandless's

15  racial animus and disparate treatment toward the custodial team, as well as evidence of Rohrer's

16  retaliation.  Dkt. 82, at 18 n.8.

17          The parties have now completed briefing on defendants' summary judgment motion (Dkt.

18  72), and the matter is ripe for decision.  As noted, the parties have also stipulated to dismissal of

19  plaintiff's claims against defendant Gilbert.  Dkt. 81.

20      **II.  Summary Judgment Motion**

21          **A.  Defendants' Materials**

22          For a second time, defendants seek summary judgment dismissal of all claims in this

23  matter.  *See* Dkt. 72.  Defendants cite to declarations and evidence in support of their previous

24

REPORT AND RECOMMENDATION - 4

summary judgment motion, including declarations from an SCCC investigator (Dkt. 29),
defendant Rohrer (Dkt. 31), defendant McCandless (Dkt. 32), and the chair shop supervisor
(Keith Morgan) (Dkt. 33).  Defendants now also provide declarations from SCCC Correctional
Captain Eric Mainio (Dkt. 73), an SCCC plant manager regarding scheduled work orders at
SCCC (Dkt. 75) and excerpts from depositions of Sherwood, Hunter, McCandless, and Rohrer.
*See* Dkt. 74.

In the SCCC, according to Captain Mainio, the "HUB" area is separate from "general
Incarcerated Living and daily movement areas" and contains maintenance and other operations
"that potentially create a higher risk of escape and introduction and movement of contraband due
to the material, tools, movement, and access by vendors and visitors."  Dkt. 73, at 2.  Direct
supervision of incarcerated workers is "often not maintained."  Dkt. 73, at 2.

Relevant to the claims in this lawsuit, the HUB area also contains EFV units where
prisoners can stay overnight with family. Dkt. 73, at 2.  The EFV units—where prisoners and
outsiders intermingle—"have historically been an avenue by which incarcerated individuals
introduce contraband into the secure perimeter of the facility." Dkt. 73, at 2.  This has been an
issue despite strip searches of prisoners and their families.  *See* Dkt. 73, at 2.

According to the SCCC investigator, in 2014, SCCC staff learned that an offender on the
custodial crew was smuggling contraband from the EFV units into the facility.  *See* Dkt. 29, at 2.
Defendant Rohrer testified at his deposition that the individual told SCCC staff that "what they
[the custodial crew] do is they pick up the drugs and they would smuggle them back into the
facility from the stove that they were hiding them in." Dkt. 74-4, at 7.  According to defendants,
the custodial crew was uniquely situated to smuggle contraband into the facility because the
custodial crew regularly and predictably accessed the EFV units, they could not be constantly

1    supervised, and they entered the EFV units right after visitors left.  *See* Dkt. 73, at 3; Dkt. 74-1,

2    at 6; Dkt. 74-4, at 12.

3          Therefore, according to defendants, in 2014 and in response to issues with the custodial

4    crew smuggling contraband into the facility, "the Superintendent, the captain, and others in the

5    chain of command [including, presumably, Rohrer] determined that the custodial crew would be

6    strip searched after they finished cleaning the EFV units."  Dkt. 29, at 3.  On November 4, 2014,

7    Chris Idso, the facility manager, emailed SCCC engineering staff that "offenders working in the

8    EFV's in a semi-supervised capacity will be strip searched when they are done" and that this

9    meant that the "porter crews" would "always" be searched.  Dkt. 31-1, at 2.  Within minutes,

10   Rohrer emailed staff that "[a]s of today all[,] EFV cleaning crews will be searched before leaving

11   the EFV unit being cleaned."  Dkt. 31-1, at 4.

12         Plaintiff was later hired onto the custodial crew (*see* Dkt. 34-1, at 7), and Rohrer claims

13   that he began having issues with plaintiff as early as January 2016.  On January 22, 2016, Rohrer

14   emailed Sherwood (plaintiff's supervisor) that Rohrer had sent plaintiff back to his unit for the

15   day after plaintiff "continued to escalate" during a discussion about his health status report

16   ("HSR").  Dkt. 31-1, at 7.  Rohrer stated that plaintiff had claimed to be unable to eat his lunch

17   even though his HSR did not document the allergies plaintiff claimed to have.  *See* Dkt. 31-1, at

18   7.  According to Rohrer, this was the second time that plaintiff had become "argumentative and

19   loud" when discussing his allergies and that Rohrer punished plaintiff by sending him back to his

20   unit due to plaintiff's "escalating and disruptive behavior."  Dkt. 31, at 4–5.

21         Rohrer states that on January 26, 2016, plaintiff was "out of bounds"—conducting

22   activities he was not authorized to do—in the kitchen and "T-Building" areas.  Dkt. 31, at 5–6.

23   Rohrer emailed staff, including Sherwood, that plaintiff was out of bounds and appeared to have

24

1    been lying to and trying to manipulate kitchen staff and a job coordinator.  *See* Dkt. 31, at 6.

2    Rohrer states that "as the Industries Sergeant, I felt that it was my job to express my security

3    concerns regarding Mr. Hunter's continued employment" and that he "did not feel [plaintiff]

4    should work in the HUB[.]"  Dkt. 31, at 6.  Rohrer states that Sherwood then suspended plaintiff.

5    Dkt. 31, at 7.

6         Plaintiff filed a grievance claiming that Rohrer and McCandless "harassed me because

7    I'm Black while working for Sherwood in the custodial office" (Dkt. 34-1, at 5) and wrote

8    Superintendent Gilbert a letter stating that he was being harassed and targeted by Rohrer on the

9    basis of racial discrimination.  Dkt. 34-1, at 7.

10        Plaintiff subsequently began work in the chair shop, where Rohrer claims that he

11   continued "to behave in ways that compromised the safety and security of the HUB[.]"  Dkt. 31,

12   at 7.  On April 11, 2016, Rohrer states that plaintiff lied about having permission to bring his

13   lunch through the HUB to the main facility and back again.  Dkt. 31, at 7.  Rohrer again emailed

14   staff about his security concerns regarding plaintiff.  Dkt. 31, at 7.  Later in April 2016, Rohrer

15   expressed concern when he learned plaintiff was being transferred back to the custodial crew,

16   stating that plaintiff had "once again been caught lying to four staff members[.]"  Dkt. 31, at 7.

17        Defendants also provide their internal investigation, concluded in July 2016, after

18   plaintiff returned to the custodial crew, finding that the allegations of staff misconduct against

19   Rohrer were unfounded.  Dkt. 34-1, at 22.

20                              **B.  Plaintiff's Materials**

21        Plaintiff originally provided only his declaration in support of his response to summary

22   judgment, with attached documents.  *See* Dkt. 38.  Plaintiff has now supplemented his evidence

23   with declarations from two other custodial crew members (Dkts. 84–85), his supplemental

24

declaration (Dkt. 83), and depositions of himself, Sherwood, Gilbert, Rohrer, and other SCCC staff members Ed Baldwin, Ryan Denzer, and Jason Miller.  *See* Dkt. 86.

Plaintiff relies on Sherwood's testimony that Sherwood began working at SCCC in July 2014 (Dkt. 86-3, at 9) and that shortly afterward, he hired the first black offenders on the custodial crew (and indeed, in the HUB).  *See* Dkt. 86-3, at 5, 7–8, 21; *see also* Dkt. 86-2, at 7 (plaintiff's deposition testimony that prisoner were complaining that "black inmates . . . [were not] able to get . . . jobs" in the HUB).  Sherwood began having issues with Rohrer and McCandless after hiring black custodial crew members:  Sherwood testified that he felt that they were "harassing [his] work crew" and unfairly targeting them for strip searches.  *See* Dkt. 86-3, at 7.  And shortly after Sherwood started, he claims that McCandless asked him "why are you hiring all these blacks[?]"  Dkt. 86-3, at 7.  Sherwood also states that Rohrer asked him the same question.  *See* Dkt. 86-3, at 8.  Indeed, another custodial crew member claims to have heard Rohrer and McCandless refer to Sherwood's crew by a racially derogatory name (Dkt. 84, at 3) and that after Sherwood hired two more black prisoners, McCandless and Rohrer seemed to be watching the custodial crew as if they "were looking to find things we were doing wrong."  Dkt. 84, at 2.

Plaintiff claims that although Idso's email referred to all "porter crews" being strip searched in response to contraband issues, Rohrer took it upon himself to apply this policy only to the primarily black custodial crew.  *See* Dkt. 82, at 6; *see also* Dkt. 83, at 2 (plaintiff's declaration stating that the custodial crew was "the only porter crew that consisted of all Black inmates" and that they had one white coworker, who did not work inside the EFV units).  Although work orders show that other maintenance crews often worked in the EFV units, plaintiff states that he does not recall that any other prisoners who worked in the EFV units were

1    strip searched—only the custodial crew.  *See* Dkt. 83, at 3; *see generally* Dkt. 83-1 (documenting

2    instances in which other maintenance crews worked in the EFV units).  Indeed, plaintiff asserts

3    that an SCCC officer told him that they were "following Rohrer's directives to always strip

4    search us [the custodial crew] no matter what."  Dkt. 83, at 6.  Plaintiff argues that racial animus

5    motivated Rohrer and that work order records show that even though other crews entered the

6    EFV units predictably and regularly, it was only the custodial crew who were targeted for strip

7    searches.  *See* Dkt. 83-1.  Moreover, most of the strip searches were not documented in

8    accordance with DOC policy (Dkt. 83, at 6), and some staff conducted the strip searches in an

9    inappropriate manner that made the custodial staff feel uncomfortable.  Dkt. 86-2, at 5.  Plaintiff

10   asserts that he and his coworkers warned Sherwood not to hire another black prisoner onto his

11   crew because that person would be harassed and targeted—as plaintiff and his coworkers had

12   been.  *See* Dkt 86-2, at 22.

13            Plaintiff also provides evidence that Rohrer's mistreatment went beyond the strip

14   searches.  According to plaintiff, Rohrer's adverse actions against him beginning January 22,

15   2016, constituted retaliation for plaintiff's complaints.  Plaintiff asserts that he was not disruptive

16   when discussing his lunch on January 22, 2016, and that Rohrer yelled in his face, called him a

17   liar, told him to "shut up," and, when plaintiff said he would seek another job, told plaintiff, "I

18   don't want your Black ass here anyway."  Dkt. 83, at 9.   Plaintiff states that he told Rohrer he

19   would file a complaint against him, prompting Rohrer to say that plaintiff was suspended and

20   would be escorted back to his unit.  Dkt. 83, at 9.

21            Plaintiff denies ever being out of bounds and states that DOC's system contains no

22   negative behavior reports about his actions in the HUB area.  Dkt. 83, at 9.  Plaintiff states that

23   on January 26, 2016, he had permission to deliver chemicals to the kitchen area and that an

24

1   employee authorized him to discuss his diet lunch with her.  Dkt. 83, at 10.  Plaintiff states that

2   he also had authorization to enter the T-building that day, where he spoke with a job coordinator

3   about his position.  Dkt. 83, at 10.

4          Plaintiff provides his January 26, 2016, grievance about Rohrer's and McCandless'

5   alleged racially based harassment of him and his letter to Superintendent Gilbert.  *See* Dkt. 83-

6   10, at 2; Dkt. 86-18.  According to plaintiff, after Rohrer learned of the grievance that plaintiff

7   had filed, Rohrer sought plaintiff out to say that Rohrer "wasn't too happy" with plaintiff's

8   grievance and that plaintiff "shouldn't be working in the CI chair shop."  Dkt. 83, at 11.  Plaintiff

9   states that subsequently, Rohrer directed his suspension from the chair shop position.  Dkt. 86-2,

10  at 20.  Plaintiff also states that McCandless targeted plaintiff and the custodial crew, including

11  taking their safety glasses and gloves while allowing white offenders to retain gloves and

12  glasses.  *See* Dkt. 83, at 14.

13         Plaintiff denies ever knowingly lying, taking contraband from the HUB area, or taking

14  his lunch out of the HUB area without permission and relies on evidence that the Facility Risk

15  Management Team declined to terminate plaintiff from his employment, despite Rohrer's claims.

16  Dkt. 83, at 10; Dkt. 86-6, at 5.  The grievance coordinator testified that Rohrer had failed to

17  properly document his concerns about plaintiff and that in fact, it appeared that plaintiff had

18  permission to take his lunch through the HUB in April 2016 and that Rohrer had given no

19  justification to terminate plaintiff.  *See* Dkt. 86-6, at 3–4.  Indeed, the grievance coordinator

20  specifically testified that he had concerns about Rohrer retaliating against plaintiff.  Dkt. 86-6, at

21  6.

22         Plaintiff also points to Sherwood's testimony that when Rohrer found out that Hunter was

23  being re-hired on the custodial crew, issues with Rohrer escalated.  Dkt. 86-3, at 14.  Rohrer

24

1    confronted Sherwood and accused him of not being "blue"—that is, "not backing" Rohrer "up."

2    Dkt. 86-3, at 14.  Rohrer emailed Sherwood and others to express his "total disagreement" and

3    recommendation that plaintiff no longer work in the HUB.  Dkt. 86-23, at 2.  In response, Chris

4    Idso stated that he saw "no infractions recently or any related to [plaintiff's] HUB employment"

5    and "no behavior log entries that would concern me about employing him in maintenance."  Dkt.

6    86-24, at 2.

7         In April 2016, plaintiff filed a grievance against Rohrer, accusing him of retaliation and

8    requesting an investigation.  Dkt. 83-15, at 2.  Plaintiff states that the grievance coordinator told

9    him that the grievances would be handled by Superintendent Gilbert.  *See* Dkt. 83, at 14.

10   Plaintiff asserts that the grievance coordinator specifically told plaintiff that there was "nothing

11   further" he could do, including no possible appeal.  Dkt. 83, at 14.  Plaintiff states that he did not

12   learn about the results of Gilbert's investigation until he had already brought this case.  Dkt. 86-

13   2, at 24.

14                                     **DISCUSSION**

15   **I. Motion to Strike**

16        Defendants include as part of their reply in support of summary judgment a motion to

17   strike certain evidence that plaintiff relies on.  *See* Dkt. 87, at 2–3.  The motion to strike is

18   granted in part and denied in part, as set forth below.

19        An affidavit or declaration "must be made on personal knowledge, set out facts that

20   would be admissible in evidence, and show that the affiant or declarant is competent to testify on

21   the matters stated."  Fed. R. Civ. P. 56(c)(4).  "A party may object that the material cited to

22   support or dispute a fact cannot be presented in a form that would be admissible in evidence."

23   Fed. R. Civ. P. 56(c)(2).

24

1   Defendants argue that plaintiff cannot interpret the work orders. *See* Dkt. 87, at 2.

2   Plaintiff has personal knowledge of what he "witnessed" regarding other work crews, so that the

3   Court declines to strike his testimony about the frequency and predictability of others' access to

4   the EFV units. *See* Dkt. 83, at 2–3.  The Court does not rely on plaintiff's interpretation of the

5   work orders, however, so that the Court declines to rule on the admissibility of plaintiff's

6   summary thereof.

7   Defendants appear to object to plaintiff's account of his interaction with Rohrer on

8   January 26, 2016 (*see* Dkt. 87, at 2) but do not specifically explain why.  The Court declines to

9   strike this portion of plaintiff's declaration.

10   Defendants object to plaintiff's claim that he has seen statements from Rohrer that he

11   directed Morgan to get plaintiff removed from his chair shop job. *See* Dkt. 87, at 2; *see also* Dkt.

12   83, at 12.  The Court grants the motion to strike because plaintiff fails to specifically identify the

13   document that he is referencing.  However, the Court notes that plaintiff testified in his

14   deposition that Rohrer directed plaintiff's suspension. *See* Dkt. 86-2, at 20.

15   Defendants object to plaintiff's recounting conversations with Dahne, the grievance

16   coordinator. *See* Dkt. 87, at 2; *see also* Dkt. 83, at 14.  However, the Court is unconvinced that

17   plaintiff could not provide this evidence at trial in a non-hearsay manner.  The Court declines to

18   strike the evidence at this time.

19   Defendants also argue that plaintiff has failed to show the relevance of Doug Baldwin's

20   deposition testimony about unspecified SCCC supervisors who only hired "white guys" because

21   this is irrelevant and improper character evidence.  Dkt. 87, at 3.  The Court agrees that it is not

22   clear whom the deposition testimony refers to and therefore does not rely on this evidence.

23

24

1    Notably, however, Sherwood himself testified that other offender crews did not include "black

2    inmates on them."  Dkt. 86-3, at 21.

3            Defendants argue that the Court should strike Baldwin's references to the "white

4    supremacy set" in the SCCC as improper lay opinion, based on speculation, and improper

5    character evidence.  Dkt. 87, at 3.   This is a reference to Baldwin's statements that McCandless

6    and Rohrer were part of the "white supremacy set" at SCCC based on their racially charged

7    views.  *See* Dkt. 86-1, at 7.  Federal Rule of Evidence 404(a)(1) forbids the use of evidence "of a

8    person's character or character trait . . . to prove that on a particular occasion the person acted in

9    accordance with the character or trait."  Therefore, the Court considers this evidence only to the

10   extent that Baldwin testified that Rohrer and McCandless made comments to Baldwin that

11   indicated that McCandless and Rohrer disapproved of Sherwood hiring an all-black crew—

12   which is not improper character evidence, does not rely on specialized knowledge, and is not

13   founded on speculation.

14           Defendants also argue that plaintiff cannot make statements about other offenders'

15   experiences with Rohrer and about Morgan's impression of plaintiff's work and cannot rely on

16   interview summaries.  *See* Dkt. 87, at 3.  The Court declines to rule on these arguments because

17   the Court has not relied on any of these materials when issuing this report and recommendation.

18       **II.  Summary Judgment Legal Standard**

19           Summary judgment is appropriate if a moving party shows that "there is no genuine

20   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

21   R. Civ. P. 56(a).  The materiality of a given fact is determined by the required elements of the

22   substantive law under which the claims are brought.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

23

24

1  242, 248 (1986).  Factual disputes that do not affect the outcome of the suit under the governing

2  law will not be considered.  *Id.*

3      Where there is a complete failure of proof concerning an essential element of the non-

4  moving party's case on which the nonmoving party has the burden of proof, all other facts are

5  rendered immaterial, and the moving party is entitled to judgment as a matter of law.  *Celotex*

6  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 254 ("the judge must view the

7  evidence presented through the prism of the substantive evidentiary burden").  However, when

8  presented with a motion for summary judgment, the court shall review the pleadings and

9  evidence in the light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255 (citation

10  omitted).

11      Once the moving party has carried its burden under Fed. R. Civ. P. 56, the party opposing

12  the motion must do more than simply show that there is some metaphysical doubt as to the

13  material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The

14  opposing party cannot rest solely on his pleadings but must produce significant, probative

15  evidence in the form of affidavits, and/or admissible discovery material that would allow a

16  reasonable jury to find in his favor.  *Id.* at n.11; *Anderson*, 477 U.S. at 249–50.  However,

17  weighing of evidence and drawing legitimate inferences from facts are jury functions, and not

18  the function of the court.  *See United Steel Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d

19  1539, 1542 (9th Cir. 1989).

20  **III.  Stipulated Dismissals**

21      As noted above, the parties have stipulated to dismiss the claims against Superintendent

22  Gilbert without prejudice.  Dkt. 81.  And in his response to the summary judgment motion,

23  plaintiff concedes that (1) he is not bringing any retaliation claim against McCandless (Dkt. 82,

24

at 17 n.7) and (2) his Eighth Amendment and Due Process claims should be dismissed.  Dkt. 82, at 24.

Therefore, the District Court should accept the concessions and dismiss claims against Gilbert without prejudice and claims under the Eighth Amendment and for violation of Due Process with prejudice.  The remaining claims are against Rohrer and McCandless for violation of the Fourth Amendment and Equal Protection and against Rohrer for retaliation.  Those claims are considered below.

### IV.  Exhaustion

Defendants argue that plaintiff failed to exhaust his claims related to McCandless' confiscating equipment from the custodial crew and failed to exhaust any of his retaliation claims.  *See* Dkt. 72, at 8–10.  They argue that the only properly exhausted claims are against Rohrer for violation of Equal Protection.  Dkt. 72, at 8.

The Court first addresses exhaustion of the claims against Rohrer, then turns to exhaustion of the claims against McCandless.

### A.  Exhaustion of the Claims against Rohrer

#### 1.  Parties' Evidence

In support of the summary judgment motion, DOC employee Jordan McKinney states that plaintiff filed three grievances related to this lawsuit while he was housed at SCCC.  *See* Dkt. 77, at 2–3.

First, on January 26, 2016, plaintiff signed a grievance stating that defendants Rohrer and McCandless were harassing him based on his race, noting, among other incidents, that Rohrer had recently suspended plaintiff and said that he was a security threat.  Dkt. 77-6, at 17.  D. Dahne, the grievance coordinator assigned to this grievance, replied on May 3, 2016, that

1    plaintiff's suspension had been lifted and he had been hired to the chair shop.  Dkt. 77-6, at 2.

2    Dahne recognized that "other issues have come up" and that Rohrer had again suspended

3    plaintiff, who returned to working on the custodial crew.  Dkt. 77-6, at 2.  Dahne stated that

4    plaintiff had acknowledged receiving a letter from Superintendent Gilbert "assuring [plaintiff]

5    that her and the facility Captain would monitor and investigate this situation further" (*see* Dkt.

6    77-8, at 11) and that plaintiff had indicated "that this was an acceptable resolution at this time."

7    Dkt. 77-6, at 2.

8          On January 27, 2016, plaintiff also signed a grievance stating that he had peanut butter

9    for lunch despite needing a peanut-free diet.  Dkt. 77-7, at 2, 8.  Dahne wrote back to plaintiff on

10   March 17, 2016, that there had been a "misunderstanding" but that the issue had been addressed.

11   Dkt. 77-7, at 2.

12         On April 16, 2016, plaintiff signed a grievance stating that Rohrer had plaintiff removed

13   from his correctional industries job and terminated as retaliation for plaintiff's pending

14   grievances against him, specifically stating that Rohrer was "out to remove me [plaintiff] from

15   the HUB for my prior complaints about him."  Dkt. 77-8, at 2, 12.  Dahne responded on May 3,

16   2016, that plaintiff's complaint was investigated, the termination was not supported, and plaintiff

17   was returned to his previous job.  Dkt. 77-8, at 2.  Again, Dahne referred to plaintiff's letter from

18   superintendent Gilbert (Dkt. 77-8, at 11) and stated that plaintiff indicated that he had received

19   "an acceptable resolution at this time."  Dkt. 77-8, at 2.

20         For his part, plaintiff relies on his own deposition testimony that he filed two of these

21   grievances about the issues underlying his lawsuit and that he also wrote a letter to

22   Superintendent Gilbert on the same day as his first grievance.  *See* Dkt. 86-2, at 23.  Plaintiff

23   understood that Dahne was investigating both grievances and that Dahne told plaintiff that

24

1   Dahne was "really not authorized to investigate other staff members concerning official

2   misconduct." Dkt. 86-2, at 23.  Plaintiff stated that he showed Dahne the letter to Gilbert and

3   that Dahne and plaintiff "decided to let Ms. Gilbert take over from there and respond to the

4   retaliation, the racial discrimination, all that stuff . . . 'cause he felt like she could do a better job

5   than he could[.]" Dkt. 86-2, at 24.

6          Plaintiff states that he subsequently complained to Dahne that he was not receiving any

7   response from Superintendent Gilbert and was concerned about timely exhausting his grievances.

8   Dkt. 86-2, at 24.  Plaintiff states that Dahne told plaintiff he had to wait and that he could not

9   appeal. Dkt. 86-2, at 24.   According to plaintiff, the first time that he learned the investigation

10  had closed and that there had been a finding that the allegations were unfounded was after

11  initiating the lawsuit.  *See* Dkt. 86-2, at 24.

12                                  **2. Discussion**

13         A portion of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), provides that "[n]o

14  action shall be brought with respect to prison conditions under section 1983 . . . or any other

15  Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

16  administrative remedies as are available are exhausted."

17         Here, plaintiff filed grievances related to Rohrer and McCandless allegedly harassing him

18  based on his race and Rohrer retaliating against him for filing the racial discrimination grievance.

19  Clearly, plaintiff's April 16, 2016 grievance, in which he specifically stated that he thought

20  Rohrer was trying to get him removed from the HUB as a result of plaintiff's prior complaints

21  against Rohrer, put prison officials on notice of plaintiff's retaliation claim against Rohrer.  *See*

22  Dkt. 77-8, at 3.

23

24

REPORT AND RECOMMENDATION - 17

1    Defendants argue that plaintiff failed to complete the process of exhausting the April 16

2    grievance. *See* Dkt. 72, at 10.  They point to Dahne's written statements that plaintiff indicated

3    that Gilbert's letter assuring plaintiff she would monitor and investigate the situation was an

4    acceptable resolution. *See* Dkt. 77-8, at 2.  And they argue that plaintiff failed to properly

5    exhaust his grievance by appealing it, "cho[osing] not to pursue it further through the grievance

6    program." Dkt. 72, at 10.

7    But where a prisoner failed to timely exhaust administrative remedies due to an

8    administrator's mistake, that failure to exhaust is excused.  *Nunez v. Duncan*, 591 F.3d 1217,

9    1224 (9th Cir. 2010).  And a prisoner is no longer obligated to exhaust if he is reliably informed

10   by an administrator that there are no remedies available.  *Brown v. Valoff*, 422 F.3d 926, 935 (9th

11   Cir. 2005).  Taking plaintiff's statements as true—as the Court must on summary judgment—

12   plaintiff was told by Dahne that plaintiff had to wait and could not appeal his grievances while

13   Gilbert's investigation was ongoing.  Dkt. 86-2, at 24.  Plaintiff did not learn before initiating

14   the lawsuit that the investigation had ended.  *See* Dkt. 86-2, at 24.  Therefore, plaintiff has

15   created genuine factual issues material to whether he is excused from exhausting his grievance

16   about retaliation, and the matter is not appropriate for resolution on summary judgment.

17   Defendants' arguments to the contrary (*see* Dkt. 87, at 8–9) are not persuasive.

18   Moreover, the Court observes that defendants do not specifically address why the Fourth

19   Amendment claim against defendant Rohrer would be unexhausted.  *See* Dkt. 72, at 8–11.  The

20   Court declines to manufacture such an argument for defendants.  The District Court should

21   disagree that plaintiff's Fourth Amendment, retaliation, or Equal Protection claims against

22   Rohrer should be dismissed on the basis of a failure to exhaust.

23   **B.  Claims against McCandless**

24

1    As noted above, plaintiff brings only Equal Protection and Fourth Amendment claims

2 against McCandless.  *Supra* part III.  Defendants argue that plaintiff has failed to exhaust any

3 claim related to McCandless' alleged confiscation of equipment and has exhausted only

4 allegations related to the strip searches.  *See* Dkt. 87, at 3.

5    Plaintiff claims that McCandless confiscated fingerless gloves from plaintiff but allowed

6 another, white worker to keep identical gloves.  *See* Dkt. 83, at 13–14.  In addition, plaintiff

7 states that McCandless took plaintiff's and plaintiff's coworkers' safety glasses even though

8 other workers were allowed to use such glasses.  Dkt. 83, at 14.  Neither of plaintiff's grievances

9 refer to these alleged events.  *See* Dkt. 77-6, at 2; Dkt. 77-8, at 2.  Although the timing of alleged

10 events is somewhat unclear, the glove incident appears to have occurred in early June 2016, well

11 after plaintiff had filed the two grievances noted above and written a letter to Superintendent

12 Gilbert.  *See* Dkt. 32, at 3.

13    The Court is not aware of any Ninth Circuit authority requiring that plaintiff, having

14 already complained of McCandless' alleged racial harassment of him "because [he is] Black,"

15 had to file a separate grievance or make a separate complaint every time that McCandless again

16 engaged in such actions.  Although the Ninth Circuit has not spoken on this issue, other circuit

17 courts have held that prisoners "need not file multiple, successive grievances raising the same

18 issue . . . if the objectionable condition is continuing."  *Turley v. Rednour*, 729 F.3d 645, 649

19 (7th Cir. 2013); *see also Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (per curiam)

20 (holding that a prisoner's 2005 grievance "provided the administration with notice of, and an

21 opportunity to resolve the same problem that would continue intermittently through 2007" and

22 therefore, the claim was sufficiently exhausted); *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d

23 1215, 1219 (11th Cir. 2010) (holding that a prisoner was "not required to initiate another round

24

1    of the administrative grievance process on the exact same issue each time" an alleged deprivation

2    of rights occurred); *Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008) (a prisoner was "not

3    required to begin the grievance process anew . . . [because] further grievances complaining of the

4    same living situation would have been redundant."); *Johnson v. Johnson*, 385 F.3d 503, 521 (5th

5    Cir. 2004) ("As a practical matter, Johnson could not have been expected to file a new

6    grievance . . . each time he was assaulted . . . Johnson's grievances were sufficient to exhaust

7    claims that arose from the same continuing failure to protect him from sexual assault.").

8            Plaintiff signed a grievance in January 2016 complaining that he was being subjected to

9    racially motivated harassment by Rohrer and McCandless, and at least one incident of equipment

10   confiscation allegedly occurred after plaintiff did so.  The record is unclear regarding the timing

11   of all the incidents.  The Court is not persuaded that plaintiff needed to file a new grievance at

12   the time of each alleged instance of discrimination.  Rather, his claims against McCandless in

13   2016, taking the evidence in the light most favorable to plaintiff, were adequate to put prison

14   officials on notice of the problem for which plaintiff sought redress.  *See Sapp v. Kimbrell*, 623

15   F.3d 813, 824 (9th Cir. 2010).  Although plaintiff did not appeal his January 2016 grievance, as

16   noted above, plaintiff has raised genuine issues of fact regarding whether he is excused from

17   exhaustion because Dahne's statements led plaintiff to believe that no further actions were

18   available regarding plaintiff's grievances against McCandless and Rohrer.  Similarly, to the

19   extent that plaintiff is bringing a separate claim against Rohrer for forcing the custodial crew

20   (and not other, white crews) to wear high visibility vests, viewed in the light most favorable to

21   plaintiff, the evidence supports that he exhausted this claim by bringing a grievance against

22   Rohrer for racial discrimination.

23           In short, defendants' arguments regarding exhaustion are unavailing.

24

1    **V. Equal Protection Claim against Rohrer**

2    Defendants argue that plaintiff's Equal Protection claim against defendant Rohrer should

3 be dismissed on summary judgment.  Dkt. 72, at 12–18.  The Court disagrees for the reasons set

4 forth below.

5     **A. Similarly Situated Group**

6    Defendants argue that relevant to the strip searches, plaintiff has not identified a similarly

7 situated comparison group.  *See* Dkt. 72, at 13.  They point to evidence that the custodial crew,

8 which was subject to the strip searches was "uniquely situated in its ability to coordinate and

9 introduce contraband."  Dkt. 72, at 12–13.  The Court finds that plaintiff has created factual

10 issues regarding whether other prisoners who were not strip searched were similarly situated to

11 the custodial crew in relevant aspects.

12     **1. Legal Principles**

13    "The Equal Protection Clause of the Fourteenth Amendment commands that no State

14 shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

15 essentially a direction that all persons similarly situated should be treated alike."  *City of*

16 *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S.

17 202, 216 (1982)).  With Equal Protection claims, then, the "first step . . . is to identify the state's

18 classification of groups" and then "look for a control group . . . composed of individuals who are

19 similarly situated to those in the classified group in respects that are relevant to the state's

20 challenged policy."  *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (citations

21 omitted); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014) ("The

22 groups need not be similar in all respects, but they must be similar in those respects relevant to

23 the Defendants' policy.").

24

1          **2. Parties' Evidence**

2          Defendants rely on Eric Mainio's (the SCCC's Correctional Captain) declaration,

3     including that the EFV units are historically a means for contraband to be smuggled into SCCC.

4     Dkt. 73, at 1.  As noted, defendants have also provided evidence that in 2014, a custodial worker

5     in the EFV units was caught smuggling drugs into the EFV units and appears to have implicated

6     the janitorial team as smuggling contraband into the facility.  Dkt. 29, at 2; Dkt. 74, at 178.

7     Mainio points out that prisoners who clean visitation rooms, the intensive management unit,

8     maximum custody units, and medical units are also strip searched.  Dkt. 73, at 4.

9          Mainio states that the "crew who cleaned the EFV units has the unique ability to

10    coordinate and introduce contraband into the facility" due to "the regularity of their access to the

11    EFV units" and "the challenges in keeping direct supervision of the individuals on this crew."

12    Dkt. 73, at 3; *see also* Dkt. 74-4, at 12 (noting that a custodial crew supervisor could not

13    constantly watch prisoners cleaning the EFV units).  Predictability is key to contraband drops,

14    according to Mainio, because otherwise "it will not be known when or who will have access to

15    the drop area at what time."  Dkt. 73, at 3.  Defendants also rely on Mark Sherwood's and

16    plaintiff's deposition testimony that the custodial crew cleaned EFV units weekly, at least once

17    and sometimes twice.  Dkt. 74-2, at 4; Dkt. 74-3, at 4.  McCandless testified that the custodial

18    team entered the EFV units "right after they empty the EFVs" and that unlike the carpenter,

19    electrician, and plumbing crews, the custodial crew had a set pattern of entering the EFV units

20    and one could predict which custodial crew member would be "going out" to the units.  Dkt. 74-

21    1, at 6.

22         Defendants also point to evidence that in contrast to the custodial crew, other work crews

23    performed work on an unpredictable basis and did not necessarily include prisoner workers.  *See*

24

1   Dkt. 72, at 13.  McCandless testified that the carpenter, electrician, and plumbing crews did not

2   go out on a set pattern and it was unpredictable which incarcerated worker would be in the EFV

3   units.  *See* Dkt. 74-1, at 6.  Indeed, plaintiff himself acknowledged that other crews only went out

4   to the EFV units "as needed."  Dkt. 30-1, at 11.

5        In response, plaintiff asserts that there is evidence that SCCC facility maintenance had

6   regular access to EFV units—accessing the units even more frequently than the custodial crew—

7   yet were not strip searched.  *See* Dkt. 82, at 19–20 (citing Dkts. 86-27 (maintenance crew work

8   orders) as showing that the custodial crew entered the units 60 times, while the construction

9   maintenance crew entered the units 95 times).  Work orders for preventative and routine work

10  performed from 2014 to 2016 show that other facility maintenance crews entered EFV units

11  regularly and sometimes more often than the custodial crew.  *See* Dkt. 75, at 2; Dkt. 75-1.  And

12  plaintiff relies on a staff member's statement that preventative maintenance occurs on regular

13  intervals and that mundane day-to-day sanitation tasks and "other automatic tasks" are not

14  recorded at all.  *See* Dkt. 75, at 2.

15                            **3. Discussion**

16       As noted, defendants have come forward with evidence that multiple factors—

17  predictability and frequency of access, scope of work, lack of direct supervision, and

18  predictability of which prisoners would be present—rendered the custodial crew unique from

19  other crews entering the EFV units, who were not strip searched.  Defendants argue that the

20  custodial crew uniquely accessed EFV units with limited supervision after the public used those

21  units and it was predictable who would be in the EFV units.  *See* Dkt. 87, at 5.

22       Crucially, however, plaintiff has created genuine factual issues regarding whether the

23  factors that defendants rely on are truly unique.  For instance, defendants argue that the custodial

24

1  crew is unique because they were often out of their supervisor's line of sight.  But plaintiff states

2  that he is not aware of ever leaving his supervisor's direct line of sight while working in the EFV

3  units.  *See* Dkt. 83, at 5.  And defendants argue that the custodial crew was uniquely in the EFV

4  units right after visitations.  But plaintiff states that the custodial crew did not enter EFV units

5  until the day after a visit, by which time an officer had searched the unit for contraband.  Dkt. 83,

6  at 5.  Thus, the Court finds factual issues regarding whether or not plaintiff has identified other,

7  similarly situated groups that were treated differently based on race—notwithstanding

8  defendants' argument to the contrary.

9         Moreover, as plaintiff points out, DOC records showing monthly hot water temperature

10  checks (*e.g.* Dkt. 75-1, at 36) and fire extinguisher inspections (*e.g.* Dkt. 75-1, at 46); quarterly

11  heat system checks (*e.g.* Dkt. 75-1, at 3); and annual fire extinguisher inspections (*e.g.* Dkt. 75-1,

12  at 4), vent cover maintenance (*e.g.* Dkt. 75-1, at 23), and smoke detector battery changes (*e.g.*

13  Dkt. 75-1, at 34) completed by crews other than the custodial crew.  There also appear to be

14  other regular activities performed in the EFV units related to daily sanitation and garbage pickup.

15  Dkt. 75, at 2.  Plaintiff states in his declaration that these other crews entered the EFV units on a

16  "regular and predictable basis."  Dkt. 83, at 2.  Presumably, this is based on plaintiff's own

17  observations, so that the Court declines to ignore the statement as requested by defendants.  *See*

18  Dkt. 87, at 5.  Therefore, there are factual issues regarding whether the custodial crew was being

19  treated differently simply because they were accessing the EFV units on a predictable basis.

20         In short, the Court finds that genuine factual issues prevent summary judgment dismissal

21  of the Equal Protection Claims related to the strip searches on the basis that plaintiff has not

22  identified a similarly situated comparison group.

23         **B.  Motivation for Strip Searches**

24

1    Defendants alternatively argue that the Equal Protection claims related to the strip

2    searches should be dismissed on summary judgment because plaintiff has failed to provide

3    evidence that the strip search policy was pretext for racial discrimination.  *See* Dkt. 72, at 14.

4    **1.  Defendants' Evidence**

5    Defendants rely on Rohrer's description of the strip search policy's inception as showing

6    a lack of pretext—

7    > After it was discovered that drugs were entering the facility through the EFVs by
     > the custodial crew in 2013 or 2014, Captain Davis ordered that the custodial crew
8    > be strip searched after they finish cleaning the EFVs as an additional security
     > measure.  On November 4, 2014, Facility Manager Chris Idso sent an email
9    > conveying this order.  The email said, ". . . it is the expectation that offenders
     > working in EFV's in a semi-supervised capacity will be strip searched when they
10   > are done.  Semi-supervised means any offender that leaves the direct line of site of
     > his/her supervisor.  Under this definition, it will always mean the porter crews.". . .
11   > . . . After receiving this directive from Captain Davis, on November 4, 2014, I sent
     > an email to staff reiterating Captain Davis's order regarding the strip searches and
12   > my initial thoughts on how they should be implemented.  On November 5, 2014, I
     > sent a follow-up email to staff with additional thoughts on how the strip searches
13   > should be implemented.

14   Dkt. 31, at 2–3; *see also* Dkt. 83-3, at 2.  Rohrer's November 4, 2014, email states that "all EFV

15   cleaning crews will be searched before leaving the EFV unit being cleaned."  Dkt. 83-4, at 2.

16   Rohrer also states that he had "no idea" of the custodial crew's racial composition and

17   denies asking Sherwood about the race of his crew.  *See* Dkt. 74-4, at 14–15.  Defendants also

18   cite to evidence noted above that the custodial crew was uniquely poised to smuggle contraband

19   from the EFV units and had, in fact, been implicated in such smuggling.  *See* Dkt. 72, at 16.  In

20   addition, defendants assert that the custodial crew was not "primarily black" and that "both black

21   and non-black members of the custodial crew were strip searched when leaving the EFV unit."

22   Dkt. 74, at 16.

23

24

REPORT AND RECOMMENDATION - 25

1        **2.  Plaintiff's Evidence**

2        For his part, plaintiff argues that there is evidence that Rohrer "took it upon himself to

3   order strip searches of only the all-Black custodial team," even though Idso requested a policy

4   that would result in strip searches of all "porter crews" who accessed the EFV units.  *See* Dkt.

5   82, at 21.  Plaintiff states that "all porter crews" means "*all* facility maintenance crews"—

6   mechanical, maintenance, and construction crews, and not just custodial crews such as

7   plaintiff's.  *See* Dkt. 83, at 5.  Moreover, plaintiff points to SCCC's own 2019 investigation

8   report, stating that interviews with Rohrer and Idso verified that the custodial crew "was the only

9   crew that were getting strip[] searched each time they go into the EFV[s]."  Dkt. 86-13, at 3.

10       Plaintiff also points to evidence that Rohrer implemented the strip search policy only

11  after Sherwood began hiring black custodial crew employees.  *See* Dkt. 82, at 21.  Sherwood

12  testified that in July 2014, he took over the custodial supervisor position in the HUB (Dkt. 86-3,

13  at 9) and that shortly thereafter, McCandless inquired about why he was "hiring all these

14  blacks[?]"  Dkt. 86-3, at 7–8.  Sherwood states that to the best of his recollection, his was the

15  only crew with black prisoners in the engineering shop.  Dkt. 86-3, at 21.  In addition, plaintiff

16  provides testimony from multiple people who recall Rohrer making racially charged statements

17  or using racial epithets to describe the custodial crew and that Rohrer appeared to unfairly target

18  the custodial crew.  *See* Dkt. 84, at 2–3; Dkt. 86-1, at 7; Dkt. 86-3, at 7–8.

19       **3.  Discussion**

20       Defendants assert that Rohrer was following Idso's direction to strip search the porter

21  crews.  But plaintiff's testimony that "porter crews" incorporated other crews, together with

22  evidence that only the custodial crews were searched and that Rohrer expressed racial animus

23

24

1  toward the custodial crew, creates genuine issues of material fact regarding whether Rohrer in

2  fact used the strip search policy as pretext to harass the primarily black custodial crew.

3        The Court is aware that defendants have provided evidence that the custodial crew was

4  uniquely found to have been smuggling contraband into the facility. *See* Dkt. 72, at 15 (citing

5  evidence). Rohrer's deposition testimony supports the conclusion that the entire crew was

6  suspected—not just one custodial crew member who had been caught smuggling contraband.

7  Dkt. 74-4, at 7; *see also* Dkt. 86-5, at 4 (". . . the drugs [were] still coming in."). Nonetheless,

8  the District Court, having reviewed the prior Report and Recommendation, specifically stated

9  that "[i]t seems irrational to only mandate strip searches of the previous crew that was implicated

10 in the wrong doing if other crews could potentially smuggle drugs in the exact same manner."

11 Dkt. 45, at 2. In addition, plaintiff has now pointed to specific evidence in the record tending to

12 support that in fact, the custodial crew was similarly situated to other, white crews that accessed

13 the EFV units yet were not searched. The Court is not inclined to recommend summary

14 judgment dismissal in light of the District Court's statement and this evidence.

15        Defendants argue that the custodial crew was not "all-black" and that "the employment

16 records for November 2014 to June 2017 . . . irrefutably show that there were 19 individuals who

17 served on the custodial crew at various times and 10 self-identified as 'black,' leaving the

18 remaining nine members as non-Black." Dkt. 87, at 6. But plaintiff has come forward with

19 evidence that Sherwood uniquely hired black workers and that other crews did not do so. *See*

20 Dkt. 86-3, at 21. Moreover, plaintiff relies on Sherwood's own statements that McCandless and

21 Rohrer referenced the racial composition of Sherwood's hires. *See* Dkt. 86-3, at 8; *see also* Dkt.

22 86-1, at 7 (Baldwin's testimony that Rohrer also made comments about Sherwood's hiring

23 practices). Even if the custodial crew was not uniformly composed of only offenders of one

24

1  race, plaintiff's evidence that it was primarily (and uniquely) composed of black prisoners

2  supports an inference of racial animus.

3         Similarly, plaintiff and defendants dispute whether a "porter" describes only a custodial

4  worker or workers from other crews, and this dispute again merits denial of the summary

5  judgment motion.  Dkt. 87, at 7; *see also* Dkt. 86-3, at 16 (describing "porters" in other contexts

6  than on the custodial crew).

7         Defendants also argue that Rohrer was, according to his deposition testimony, not aware

8  of the racial composition of the custodial crew at the time of his actions regarding the strip

9  search policy's implementation—so that racial animus could not have motivated Rohrer.  *See*

10  Dkt. 87, at 7.  But Sherwood states that he started hiring black offenders (eliciting a comment

11  from McCandless about the race of the new custodial crew hires) shortly after he was hired in

12  July 2014—creating a reasonable inference that the strip search policy's implementation in

13  November 2014 came after Sherwood's hiring practices had already begun.  *See* Dkt. 86-3, at 7;

14  *but see* Dkt. 86-5, at 3–4 (Rohrer claims that Sherwood started after the strip searches began).

15  Moreover, although Sherwood could not recall the date of Rohrer's own alleged comment on

16  Sherwood's hiring practices, this does not merit summary judgment dismissal, but instead

17  illustrates factual issues regarding whether and when Rohrer allegedly became aware of

18  Sherwood's hiring practices.  *See* Dkt. 86-3, at 8.  The Court notes that Sherwood stated that

19  Rohrer was his direct supervisor and that Rohrer and McCandless "work[ed] right next to each

20  other" and were talking "all the time."  Dkt. 86-3, at 8.  The Court is unable to say, on this

21  record, that there is no genuine dispute that Rohrer was unaware of the racial composition of the

22  custodial crew.

23

24

1    Nor is the Court convinced by defendants' arguments that strip searches of both black

2    and non-black custodial crews show that, as matter of law, the strip search policy was not pretext

3    for racial discrimination.  Even if custodial crew members of both races were strip searched,

4    disproportionately targeting a primarily black crew for strip searches while declining to search

5    non-black crews could support such a claim, particularly in the context of the alleged racial

6    comments made by Rohrer.

7    Defendants also point to evidence that other prisoners who had access to high security

8    areas were strip searched.  *See* Dkt. 87, at 8.  However, even if other custodial crews were strip

9    searched regardless of race, a fact finder could still find from plaintiff's evidence that Rohrer

10   applied the strip search policy within the HUB as a means to racially discriminate against the

11   primarily black custodial crew.

12   The District Court should decline to grant summary judgment dismissal of the claims

13   against defendant Rohrer for violation of Equal Protection.

14   **VI.  Fourth Amendment Claims against Rohrer**

15   Plaintiff alleges that Rohrer violated the Fourth Amendment because there was no valid

16   penological justification for the strip search policy and because it resulted in unreasonable strip

17   searches of the custodial crew on a routine basis.  *See* Dkt. 67, at 14.  Regarding this claim

18   against Rohrer, defendants argue that the strip search policy was permissible under the Fourth

19   Amendment and that to the extent that individual searches were unreasonable and harassing,

20   plaintiff has failed to show that Rohrer participated in the searches.  *See* Dkt. 72, at 19–20.

21   "[T]he Fourth Amendment . . . appl[ies] to the invasion of bodily privacy in prisons."

22   *Bull v. City & Cty. of S.F.*, 595 F.3d 964, 974–75 (9th Cir. 2010).  "Whether a search is

23   reasonable under the Fourth Amendment requires a case-by-case 'balancing of the need for the

24

1    particular search against the invasion of personal rights that the search entails.'" *Byrd v.*

2    *Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (quoting *Bell,* 441 U.S. 520,

3    559 (1979)). "The required factors for courts to consider include: (1) the scope of the particular

4    intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the

5    place in which it is conducted." *Id.* (internal quotation marks and citation omitted).

6                    **A.  Parties' Evidence**

7            As noted above, plaintiff points to evidence that other facility maintenance members

8    were in the EFV units even more often than his custodial crew, including for daily sanitation, and

9    plaintiff states that he observed regular and predictable access by other crews. *See* Dkt. 75, at 2;

10   Dkt. 83, at 2; Dkt. 83-1.  And plaintiff disputes that the custodial crew entered EFV units right

11   after visitations or was out of their supervisor's site. *See* Dkt. 83, at 5.

12           Moreover, plaintiff asserts that the strip searches were not conducted consistent with DOC

13   policy.  *See* Dkt. 82, at 8.  DOC policy 420.310 requires that searches are conducted "in a

14   professional manner . . . and avoiding . . . embarrassment, or indignity to the offender being

15   searched." Dkt. 83-5, at 3.  The policy also requires documentation of each strip search, including

16   the dates, offender names and DOC numbers, reason for the search, and names and genders of

17   employees conducting the search. Dkt. 83-5, at 5.  However, plaintiff states that the vast majority

18   of the strip searches were never properly documented (Dkt. 83, at 6; *see also* Dkt. 76-1 (DOC

19   records showing three strip searches of plaintiff); Dkt. 83, at 6 (plaintiff's declaration that he was

20   subjected to at least 25 strip searches)) and that they were sometimes conducted in an inappropriate

21   and unnecessarily humiliating manner.  *See* Dkt. 86-2, at 5.  In addition, superintendent Gilbert

22   stated that strip searches were not supposed to be done inside the EFV units. *See* Dkt. 86-4, at 6.

23

24

1          **B. Discussion**

2          A routine, mandatory strip search policy may be constitutional.  *See Bull*, 595 F.3d at

3    974.  Here, however, plaintiff has provided evidence from which a fact finder could conclude

4    that Rohrer implemented a policy of strip searching only the custodial crew, without requiring

5    documentation or that the strip searches be conducted in the appropriate location, as a pretext for

6    racial discrimination.  Plaintiff has come forward with evidence creating factual disputes

7    material to the manner of the searches, the justifications for them, and the place in which they

8    were conducted—several of the factors that the Court must consider in assessing the

9    reasonableness of such a policy.  *See Byrd*, 629 F.3d at 1141.  For instance, plaintiff alleges that

10   the strip searches were conducted in the EFV units themselves and without appropriate

11   documentation and provides Superintendent Gilbert's testimony that strip searches were

12   supposed to take place in designated areas and to be documented to avoid the possibility of staff

13   misconduct.  *See* Dkt. 86-4, at 6.  Defendants notably provide no argument about why it was

14   reasonable or necessary to dispense with these requirements.  *See* Dkt. 72, at 3–4, 18–20; Dkt.

15   87, at 12–13.  And as noted above, the Court finds factual issues related to whether the policy

16   was a pretext for racial discrimination.  *See supra*, Part V.

17          Defendants argue that plaintiff has not shown that Rohrer directed searches in a manner

18   that did not comply with DOC or SCCC policy.  *See* Dkt. 87, at 12.  But Rohrer's email

19   specifically directed searching the EFV cleaning crews before they left the unit being cleaned—a

20   practice that Superintendent Gilbert testified would be improper.  *See* Dkt. 83-4, at 2; Dkt. 86-4,

21   at 6.  Rohrer's email also directs staff to record the names and numbers of those strip searched

22   but does not require staff to record the search date or reason or the names and genders of the

23   employees conducting the searches, as required by DOC policy.  *See* Dkt. 83-4, at 2; Dkt. 83-5,

24

1  at 5.  In short, there are questions of fact regarding the extent to which Rohrer directed searches

2  that violated DOC and SCCC policy.

3        Finally, defendants argue that plaintiff has failed to provide evidence that defendant

4  Rohrer should be liable for specific instances in which individual officers abused the strip search

5  policy and conducted strip searches in a harassing manner.  *See* Dkt. 72, at 19.  However,

6  defendant Rohrer testified that he participated in at least some of the searches (Dkt. 86-5, at 5),

7  so that the Court declines to recommend dismissal of claims that Rohrer participated in particular

8  strip searches that were conducted improperly.

9        **VII.  Retaliation Claim against Rohrer**

10       Plaintiff asserts that on January 22, 2016, he threatened to file a grievance against

11  defendant Rohrer and that Rohrer then "began a pattern of retaliatory conduct" toward plaintiff,

12  including sending plaintiff back to his unit on January 26, 2016, and attempting to have plaintiff

13  terminated from employment in the HUB.  Dkt. 67, at 6; *see* Dkt. 82, at 9–15.

14            **A.  Defendants' Evidence**

15       According to Rohrer, he perceived plaintiff as "an offender [who] seems to find it

16  difficult to follow the rules when the rules do not serve his purposes" and whose "behavior was a

17  cause for concern."  Dkt. 31, at 3.  Rohrer states that on January 20, 2016, plaintiff complained

18  about his lunch in the HUB dining hall in an "argumentative and loud" manner, stating that he

19  was allergic to various items, and that Rohrer requested to see plaintiff's health status report.

20  Dkt. 31, at 3–4.

21       Rohrer states that on January 22, 2016, plaintiff showed Rohrer plaintiff's health status

22  report, which did not document plaintiff's claimed allergy to "the black things in the salami[.]"

23  Dkt. 31, at 4.  Rohrer states that plaintiff became disruptive and raised his voice toward Rohrer,

24

1    so that Rohrer "sent him back to his unit for the remainder of the day."  Dkt. 31, at 4.  Rohrer

2    states that his actions were based on plaintiff's behavior, not any improper purpose.  Dkt. 31, at

3    5.

4           According to Rohrer, on January 26, 2016, plaintiff was "out of bounds" twice.  Dkt. 31,

5    at 5.  In the morning, plaintiff went to the back of the kitchen, where he was not allowed to be,

6    and spoke to a kitchen staff member about his allergies and dietary requirements.  Dkt. 31, at 5–

7    6.  The kitchen staff member wrote an incident report stating that plaintiff had lied to her about

8    his diet and whether he had spoken to the food manager.  *See* Dkt. 31-1, at 9.  Later, according to

9    Rohrer, plaintiff approached a job coordinator in another building to speak to her about obtaining

10   a different job position.  Dkt. 31, at 6.  The job coordinator emailed Rohrer about the incident

11   (Dkt. 31-1, at 11), and Rohrer states that he then emailed Sherwood, plaintiff's supervisor, about

12   the incident, as well as contacting other staff about what Rohrer perceived as plaintiff lying and

13   attempting to manipulate staff.  Dkt. 31, at 6.  Sherwood suspended plaintiff that day, according

14   to Rohrer.  Dkt. 31, at 7.

15          According to Rohrer, plaintiff started working in the chair shop, and on April 11, 2016,

16   Rohrer learned that plaintiff had "failed to follow the directive of his supervisor, CI Supervisor

17   Keith Morgan, to report to the HUB Access for a callout, lied to an officer about having approval

18   to pick up a lunch early, and then lied to another officer about having approval to take his lunch

19   through the HUB to the main facility and back in violation of security rules."  Dkt. 31, at 7.

20   Rohrer emailed staff regarding his concerns on April 13, 2016.  Dkt. 31, at 7.

21          Finally, on April 20 and 28, 2016, Rohrer emailed staff regarding plaintiff having

22   allegedly been caught lying to additional staff members, bringing contraband food out of the

23   HUB.  Dkt. 31, at 7.

24

REPORT AND RECOMMENDATION - 33

1          **B.  Plaintiff's Evidence**

2          For his part, plaintiff asserts that on January 20, 2016, Rohrer refused to look up

3     plaintiff's health status report to confirm his allergies, forcing plaintiff to forego his lunch that

4     day.  Dkt. 83, at 8.  Plaintiff asserts that he was allergic to the peanut products in his lunch box—

5     not the "black things in the salami."  Dkt. 83, at 8.  Plaintiff states that on January 22, 2016, he

6     showed Rohrer his medical records documenting his peanut and sunflower allergies.  Dkt. 83, at

7     8.  Plaintiff denies that he was loud or disruptive but asserts that Rohrer yelled directly in

8     plaintiff's face and called plaintiff a liar.  Dkt. 83, at 8–9.  According to plaintiff, when he said

9     he would look for another job, Rohrer replied that he "d[id not] want your Black ass here

10    anyway."  Dkt. 83, at 9.  Plaintiff states that he threatened to file a grievance against Rohrer, and

11    that Rohrer then told plaintiff that Rohrer was suspending plaintiff.  Dkt. 83, at 9.  Rohrer

12    directed another corrections officer to escort plaintiff back to his unit.  Dkt. 83, at 9.

13         Plaintiff also denies that he was ever out of bounds.  Dkt. 83, at 9.  He states that on the

14    morning of January 26, 2016, he had been authorized to be at the back of the kitchen dock to

15    deliver chemicals.  Dkt. 83, at 10.  Plaintiff avers that the kitchen worker gave plaintiff

16    permission to speak to her about his special diet lunch.  Dkt. 83, at 10.  Regarding the incident

17    with the job coordinator, plaintiff states that he had again been authorized to enter the building,

18    to pick up custodial items.  Dkt. 83, at 10.  He states that he spoke with the job coordinator about

19    potentially working in the chair shop but denies that he lied or manipulated anyone.  Dkt. 83, at

20    10.

21         Plaintiff states that after Rohrer learned plaintiff had filed the racial harassment

22    grievance, Rohrer confronted plaintiff and "told [plaintiff] that he wasn't too happy with the

23    grievance [plaintiff] wrote and that [plaintiff] shouldn't be working in the CI Chair Shop."  Dkt.

24

83, at 11.  On April 11, 2016, plaintiff asserts that he obtained permission to take his special diet

lunch box with him to a call out, denying Rohrer's claim that plaintiff lied to two officers to

bring his lunch with him.  Dkt. 83, at 12.  Plaintiff asserts that he has observed "numerous

offenders" take their lunches through HUB in such a manner, with staff permission.  Dkt. 83, at

12.

### C.  Legal Principles and Discussion

"Within the prison context, a viable claim of First Amendment retaliation entails five

basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2)

because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

exercise of his First Amendment rights, and (5) the action did not reasonably advance a

legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005)

(footnote omitted).

Defendants first argue that plaintiff has failed to come forward with evidence that his

protected activity was the motivation for the adverse actions that Rohrer took.  *See* Dkt. 72, at

22.  However, taking plaintiff's evidence as true, Rohrer told plaintiff directly that he was not

pleased with plaintiff filing a grievance and that Rohrer thought plaintiff should not be working

in the chair shop.  *See* Dkt. 83, at 11.  Although defendants point out that plaintiff gave contrary

testimony in his deposition (*see* Dkt. 86-2, at 23), plaintiff has provided evidence that other

staff—the chair shop supervisor and the grievance coordinator—told plaintiff either that "things"

had escalated because plaintiff filed the grievance or that Rohrer was upset with plaintiff about

the grievance.  *See* Dkt. 86, at 34, 38.  Taken as true, this raises a reasonable inference that

Rohrer had a retaliatory motive toward plaintiff, even setting aside plaintiff's own testimony

about Rohrer's statements.

1    Defendants' second argument is that even if plaintiff has shown that Rohrer had a

2  retaliatory motive, plaintiff has not shown the lack of a valid penological goal for Rohrer's

3  actions.  Dkt. 72, at 22.  Plaintiff bears the burden of showing the absence of legitimate

4  correctional goals for the conduct of which he complains.  *Pratt v. Rowland*, 65 F.3d 802, 806

5  (9th Cir. 1995).  Nonetheless, "prison officials may not defeat a retaliation claim on summary

6  judgment simply by articulating a general justification for a neutral process, when there is a

7  genuine issue of material fact as to whether the action was taken in retaliation for the exercise of

8  a constitutional right."  *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) ("If . . . the defendants

9  abused the gang validation procedure as a cover or a ruse to silence and punish [the prisoner]

10 because he filed grievances, they cannot assert that [his] validation served a valid penological

11 purpose, even though he may have *arguably* ended up where he belonged.").

12    Plaintiff denies that he talked loudly or raised his voice toward Rohrer or that he was

13 disruptive on January 22, 2016.  *See* Dkt. 83, at 9.  Plaintiff also provides supporting declarations

14 from other prisoners that plaintiff was cooperative with Rohrer about the diet incident and that

15 on January 22, it was Rohrer, not plaintiff, whom prisoners heard yelling.  *See* Dkt. 85, at 2.

16 Plaintiff also states that another corrections officer was present during his conversation with the

17 kitchen staff member on January 26, 2014, and that this officer went to Rohrer afterward.  *See*

18 Dkt. 86-2, at 11.  The Court finds that the corrections officer's going to Rohrer—and not

19 warning plaintiff not to speak with kitchen staff at the time—supports an inference that Rohrer

20 abused the policy about being "out of bounds" as a pretext to retaliate against plaintiff.

21 Moreover, plaintiff has now come forward with evidence that grievance coordinator Dahne

22 asked Rohrer to substantiate his claim that plaintiff was a security risk because Dahne could not

23 find any records to support this conclusion.  *See* Dkt. 86-19, at 3 ("His infraction history is good

24

1    and work evaluations are above average."). Rohrer acknowledged that he had failed to properly

2    document plaintiff's behaviors regarding his diet. *See* Dkt. 86-19, at 2.

3            Regarding the April 22, 2016, incident with plaintiff taking his lunch from the HUB,

4    plaintiff points to deposition testimony from an SCCC staff member, Ryan Denzer, (*see* Dkt. 86-

5    6, at 4) that Denzer personally confirmed that plaintiff had permission to bring his lunch through

6    the HUB area. *See* Dkt. 86-6, at 4. Indeed, Denzer testified that he had concerns that Rohrer

7    was retaliating against plaintiff. *See* Dkt. 86-6, at 6 ("I've got so many e-mails from . . . Mr.

8    Rohrer explaining to me all these alleged things that Mr. Hunter is doing. But I have no

9    documentation to support what he's saying to me. . . . It just seems like he was just so focused

10   on Mr. Hunter.").

11           In the Court's view, this evidence raises triable issues of fact regarding whether Rohrer's

12   claimed security concerns about plaintiff were pretextual for retaliation.

13           Finally, defendants briefly appear to argue that Rohrer's actions were too minimal to

14   constitute an adverse action. *See* Dkt. 72, at 23 n.5. The Court disagrees. An adverse action—

15   within the retaliation context—is one that would be sufficient to chill a person of ordinary

16   firmness. *See Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009). The threat of losing

17   paying employment and being labelled a "security threat" is sufficiently serious that it would

18   chill an ordinary person. *See also Klein v. Williams*, 714 Fed. App'x 631, 636 (9th Cir. 2017) (a

19   person of ordinary firmness would be chilled by threat of terminating prison employment).

20           The District Court should not dismiss the retaliation claims against Rohrer on summary

21   judgment.

22

23

24

1        **VIII.  Claims against McCandless**

2              As noted, plaintiff's remaining claims against McCandless are for violation of the Fourth

3        Amendment and Equal Protection.  Defendants argue that plaintiff has failed to come forward

4        with evidence tending to show that McCandless violated his constitutional rights.  *See* Dkt. 72, at

5        16.

6              In his response to the summary judgment motion, plaintiff sets forth the following

7        evidence about McCandless' role in the events at issue, which the Court must take as true.

8        McCandless asked Sherwood "why are you hiring all these blacks[?]," and McCandless and

9        Rohrer referred to Sherwood's shop on other occasions as "SherHood."  *See* Dkt. 83, at 4; Dkt.

10       84, at 3; Dkt. 86-3, at 7.  Another custodial crew member noticed McCandless and Rohrer

11       watching the custodial crew as if they were looking to find something wrong.  Dkt. 84, at 2.  In

12       January 2016, plaintiff told McCandless that plaintiff was allergic to a portion of his lunch;

13       Rohrer intervened in this disagreement.  Dkt. 83, at 8.  A few days later, McCandless stood by

14       while Rohrer yelled at and belittled plaintiff.  Dkt. 86-2, at 15.  McCandless confiscated

15       plaintiff's fingerless gloves and plaintiff's and the rest of the custodial crew's safety glasses.

16       Dkt. 83, at 14.

17             Defendants argue that plaintiff has failed to show that his allegations that McCandless

18       acted based on racial animus are founded on anything more than speculation.  Dkt. 72, at 17.  In

19       the Court's view, plaintiff's allegations that McCandless made repeated racially charged

20       comments about Sherwood's custodial crew (*see* Dkt. 83, at 4; Dkt. 84, at 3; Dkt. 86-3, at 7),

21       stood by allegedly laughing while Rohrer berated plaintiff (Dkt. 86-2, at 15), and worked

22       alongside Rohrer are adequate evidence from which a reasonable fact finder could conclude that

23       McCandless was also motivated by racial animus when he confiscated plaintiff's fingerless

24

1   gloves and confiscated plaintiff's and the rest of the custodial crew's safety glasses.  Dkt. 83, at

2   14.

3            Defendants also assert that plaintiff has not shown "that other similarly situated

4   individuals were not 'talked to . . . regarding safety glasses being taken.'"  Dkt. 72, at 17.[1]  But

5   plaintiff has come forward with evidence that McCandless confiscated all the custodial crew's

6   safety glasses, even though the other crews were allowed to wear safety glasses.  *See* Dkt. 83, at

7   14; Dkt. 84, at 3; Dkt. 85, at 3.  This is adequate evidence to create a factual conflict regarding

8   whether a similarly situated group of non-black offenders was treated differently.

9            Defendants argue that none of this evidence shows that McCandless participated in either

10  the implementation of the strip search policy or the strip searches.  *See* Dkt. 72, at 17.  In

11  response, plaintiff points to no evidence that McCandless participated in the strip search policy's

12  implementation or execution, so that plaintiff fails to show that the Fourth Amendment claim

13  against McCandless should survive the summary judgment motion.  *See* Dkt. 82, at 6; *see also*

14  Dkt. 83, at 6 (plaintiff's declaration that his coworkers and he "were harassed by Rohrer and

15  subjected to at least 25 nude strip searches or more, conducted by" officers other than

16  McCandless).  Therefore, to the extent that plaintiff brings suit against McCandless for violating

17  the Fourth Amendment, such a claim should be dismissed.  Moreover, as noted above, plaintiff

18  has conceded to dismissal of any retaliation claim against McCandless and his Due Process and

19  Eighth Amendment claims.  *See* Dkt. 82 at 24 & n.10.  The sole remaining claim against

20  McCandless should be for violating Equal Protection by allegedly confiscating the gloves and

21  safety glasses.

22

23  ───────────────

24            [1] Defendants do not argue that plaintiff has failed to show a similarly situated comparison group related to his claim about the gloves.

1    **IX.  Qualified Immunity**

2         Defendants argue that they are entitled to qualified immunity from plaintiff's claims for

3    damages because plaintiff "has failed to demonstrate a constitutional violation" and because

4    defendants were acting consistent with legitimate concerns related to prison security.  *See* Dkt.

5    72, at 24.  As discussed in detail above, the Court finds that plaintiff has provided evidence from

6    which a rational trier of fact could find in his favor on his remaining constitutional claims.

7    Moreover, this evidence also supports that Rohrer and McCandless were not, in fact, acting

8    consistent with legitimate correctional concerns, but rather with racial animus and that Rohrer

9    acted on the basis of retaliation and did not legitimately believe that plaintiff was a security

10   concern.

11        Defendants' argument regarding whether the law at issue was clearly established at the

12   time merely reiterates their conclusion that Rohrer was simply "creat[ing] strip search

13   procedure" and "express[ing] concerns about Hunter's misbehavior when [Rohrer] had genuine

14   safety and security concerns about both of those issues[.]"  Dkt. 87, at 13.  When considering a

15   qualified immunity argument on summary judgment, the Court takes the facts in the light most

16   favorable to plaintiff.  *E.g.* J*effers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001).  Defendants'

17   characterization of the facts is flawed because it looks to the facts in the light most favorable to

18   them, however, when assessing whether the actions at issue violated clearly established law.

19   Qualified immunity should not be granted, and the Court declines to further address defendants'

20   conclusory qualified immunity arguments.

21                                     **CONCLUSION**

22        The summary judgment motion (Dkt. 72) should be granted in part and denied in part.

23   The District Court should accept plaintiff's narrowing of his claims to allegations that Rohrer

24

1    and McCandless violated Equal Protection and the Fourth Amendment and that Rohrer also

2    retaliated against plaintiff and should dismiss all other claims.  The Fourth Amendment claim

3    against McCandless should also be dismissed, but the remaining claims should survive.  Gilbert

4    should be terminated as a defendant in this action.

5            Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

6    fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

7    6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

8    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

9    of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

10   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

11   imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **May 7, 2021**

12   as noted in the caption.

13           Dated this 21st day of April, 2021.

14

15   _____

16   J. Richard Creatura
     Chief United States Magistrate Judge

17

18

19

20

21

22

23

24

REPORT AND RECOMMENDATION - 41